EXHIBIT 2

**THE STATE EDUCATION DEPARTMENT** / THE UNIVERSITY OF THE STATE OF NEW YORK



OFFICE OF STATE REVIEW, 80 Wolf Road, Suite 203, Albany, New York 12205-2643
Tel. 518-485-9373
Fax 518-485-9377

September 20, 2023

Farah-Lise Rousseau, Esq.
Interim Acting Senior Executive Director
The NYC Department of Education
Impartial Hearing Office
131 Livingston Street - Room 201
Brooklyn, NY  11201

　　　　**Re:　S.A. o/b/o Z.A. v. New York City Department of Education**
　　　　　　**Appeal No 23-157; IHO Case No. 243409**

Dear Ms. Rousseau:

　　　　Enclosed is a copy of Decision No. 23-157 of the State Review Officer in the above-entitled matter.

　　　　The original has been sent today directly to the New York City Department of Education to the attention of of Liz Vladeck, General Counsel.

　　　　Thank you.

'23 SEP 22 PM 2:10

　　　　　　　　　　　　　　　Sincerely,


　　　　　　　　　　　　　　　Cynthia DiVirgilio
　　　　　　　　　　　　　　　Legal Assistant 2

Enclosure

IMPARTIAL HEARING OFFICE



# The University of the State of New York

## The State Education Department
### State Review Officer
#### www.sro.nysed.gov

No. 23-157

**Application of a STUDENT WITH A DISABILITY, by his parent, for review of a determination of a hearing officer relating to the provision of educational services by the New York City Department of Education**

**Appearances:**

Brain Injury Rights Group, Ltd., attorneys for petitioner, by Zack Zylstra, Esq.

Liz Vladeck, General Counsel, attorneys for respondent, by Cynthia Sheps, Esq.

## DECISION

### I. Introduction

This proceeding arises under the Individuals with Disabilities Education Act (IDEA) (20 U.S.C. §§ 1400-1482) and Article 89 of the New York State Education Law. Petitioner (the parent) appeals from the decision of an impartial hearing officer (IHO) which denied her request to be reimbursed for her son's tuition costs at the International Academy for the Brain (iBrain) for the 2022-23 school year. Respondent (the district) cross-appeals from the IHO's order directing the district to fund an independent neuropsychological evaluation of the student. The appeal must be sustained in part and the matter remanded to the IHO for further administrative proceedings. The cross-appeal must be sustained.

### II. Overview—Administrative Procedures

When a student in New York is eligible for special education services, the IDEA calls for the creation of an individualized education program (IEP), which is delegated to a local Committee on Special Education (CSE) that includes, but is not limited to, parents, teachers, a school psychologist, and a district representative (Educ. Law § 4402; see 20 U.S.C. § 1414[d][1][A]-[B]; 34 CFR 300.320, 300.321; 8 NYCRR 200.3, 200.4[d][2]). If disputes occur between parents and school districts, incorporated among the procedural protections is the opportunity to engage in mediation, present State complaints, and initiate an impartial due process hearing (20 U.S.C.

§§ 1221e-3, 1415[e]-[f]; Educ. Law § 4404[1]; 34 CFR 300.151-300.152, 300.506, 300.511; 8 NYCRR 200.5[h]-[l]).

New York State has implemented a two-tiered system of administrative review to address disputed matters between parents and school districts regarding "any matter relating to the identification, evaluation or educational placement of a student with a disability, or a student suspected of having a disability, or the provision of a free appropriate public education to such student" (8 NYCRR 200.5[i][1]; see 20 U.S.C. § 1415[b][6]-[7]; 34 CFR 300.503[a][1]-[2], 300.507[a][1]). First, after an opportunity to engage in a resolution process, the parties appear at an impartial hearing conducted at the local level before an IHO (Educ. Law § 4404[1][a]; 8 NYCRR 200.5[j]). An IHO typically conducts a trial-type hearing regarding the matters in dispute in which the parties have the right to be accompanied and advised by counsel and certain other individuals with special knowledge or training; present evidence and confront, cross-examine, and compel the attendance of witnesses; prohibit the introduction of any evidence at the hearing that has not been disclosed five business days before the hearing; and obtain a verbatim record of the proceeding (20 U.S.C. § 1415[f][2][A], [h][1]-[3]; 34 CFR 300.512[a][1]-[4]; 8 NYCRR 200.5[j][3][v], [vii], [xii]). The IHO must render and transmit a final written decision in the matter to the parties not later than 45 days after the expiration period or adjusted period for the resolution process (34 CFR 300.510[b][2], [c], 300.515[a]; 8 NYCRR 200.5[j][5]). A party may seek a specific extension of time of the 45-day timeline, which the IHO may grant in accordance with State and federal regulations (34 CFR 300.515[c]; 8 NYCRR 200.5[j][5]). The decision of the IHO is binding upon both parties unless appealed (Educ. Law § 4404[1]).

A party aggrieved by the decision of an IHO may subsequently appeal to a State Review Officer (SRO) (Educ. Law § 4404[2]; see 20 U.S.C. § 1415[g][1]; 34 CFR 300.514[b][1]; 8 NYCRR 200.5[k]). The appealing party or parties must identify the findings, conclusions, and orders of the IHO with which they disagree and indicate the relief that they would like the SRO to grant (8 NYCRR 279.4). The opposing party is entitled to respond to an appeal or cross-appeal in an answer (8 NYCRR 279.5). The SRO conducts an impartial review of the IHO's findings, conclusions, and decision and is required to examine the entire hearing record; ensure that the procedures at the hearing were consistent with the requirements of due process; seek additional evidence if necessary; and render an independent decision based upon the hearing record (34 CFR 300.514[b][2]; 8 NYCRR 279.12[a]). The SRO must ensure that a final decision is reached in the review and that a copy of the decision is mailed to each of the parties not later than 30 days after the receipt of a request for a review, except that a party may seek a specific extension of time of the 30-day timeline, which the SRO may grant in accordance with State and federal regulations (34 CFR 300.515[b], [c]; 8 NYCRR 200.5[k][2]).

## III. Facts and Procedural History

The parties' familiarity with this matter is presumed and, therefore, the facts and procedural history of the case and the IHO's decision will not be recited here in detail. The committee on preschool education (CPSE) convened on March 22, 2022, to formulate the student's IEP for the 2022-23 school year (see generally Parent Ex. B).[1]   The parent disagreed with the

---

[1] The hearing record contains two copies of the March 2022 IEP with the parent exhibit additionally including a

recommendations contained in the March 2022 IEP and, as a result, notified the district of her intent to unilaterally place the student at iBrain (see Parent Ex. D). In a due process complaint notice, dated December 6, 2022, the parents alleged that the district failed to offer the student a free appropriate public education (FAPE) for the 2022-23 school year (see Parent Ex. A).

After a prehearing conference on January 31, 2023, an impartial hearing convened on March 9, 2023 and concluded on April 25, 2023 after five days of proceedings (Tr. pp. 1-222). In a decision dated June 19, 2023, the IHO determined that the district offered the student a free appropriate public education (FAPE) for the 2022-23 school year, and, as such, she did not reach a determination on the appropriateness of iBrain as a unilateral placement or whether equitable considerations weighed in favor of the parents' request for an award of tuition reimbursement (IHO Decision at p. 10). With regard to the parent's request for a publicly funded independent educational evaluation (IEE), upon finding that the parent had expressed disagreement with the district's evaluation of the student, the IHO ordered the district to fund an independent neuropsychological evaluation (id. at pp. 11-12).

## IV. Appeal for State-Level Review

The parties' familiarity with the particular issues for review on appeal in the parent's request for review and the district's answer thereto is also presumed and, therefore, the allegations and arguments will not be recited here. The crux of the parties' dispute on appeal is whether the IHO erred in determining that the district met its burden to prove that it offered the student a FAPE for the 2022-23 school year and, more particularly, whether the recommendations of the CPSE that the student attend an 8:1+2 special class and receive related services at 30-minute durations and special transportation were appropriate to meet the student's needs. In addition, in the event that it is determined that the IHO erred in her determination that the district provided the student with a FAPE, the parent requests findings: (1) that iBrain is an appropriate unilateral placement for the student; (2) that equitable considerations favor the parent's claim for district funding of tuition, related services and transportation for the 2022-23 school year; and (3) that the parent be awarded the requested relief via direct payment.

In its answer and cross-appeal, the district argues that the IHO's determination that the district offered the student a FAPE for the 2022-23 school year should be upheld, but asserts that the IHO erred in directing the district to fund an independent neuropsychological evaluation.

## V. Applicable Standards

Two purposes of the IDEA (20 U.S.C. §§ 1400-1482) are (1) to ensure that students with disabilities have available to them a FAPE that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living; and (2) to ensure that the rights of students with disabilities and parents of such students are protected (20 U.S.C. § 1400[d][1][A]-[B]; see generally Forest Grove Sch. Dist. v.

---

least restrictive environment (LRE) checklist for preschool placements (compare Parent Ex. B at pp. 1-20, with Dist. Ex. 1 at pp. 1-14). For purposes of this decision, only the parent exhibit is cited.

T.A., 557 U.S. 230, 239 [2009]; Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 206-07 [1982]).

A FAPE is offered to a student when (a) the board of education complies with the procedural requirements set forth in the IDEA, and (b) the IEP developed by its CSE through the IDEA's procedures is reasonably calculated to enable the student to receive educational benefits (Rowley, 458 U.S. at 206-07; T.M. v. Cornwall Cent. Sch. Dist., 752 F.3d 145, 151, 160 [2d Cir. 2014]; R.E. v. New York City Dep't of Educ., 694 F.3d 167, 189-90 [2d Cir. 2012]; M.H. v. New York City Dep't of Educ., 685 F.3d 217, 245 [2d Cir. 2012]; Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 [2d Cir. 2005]). "'[A]dequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP'" (Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 129 [2d Cir. 1998], quoting Rowley, 458 U.S. at 206; see T.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 253 [2d Cir. 2009]). The Supreme Court has indicated that "[t]he IEP must aim to enable the child to make progress. After all, the essential function of an IEP is to set out a plan for pursuing academic and functional advancement" (Endrew F. v. Douglas Cty. Sch. Dist. RE-1, 580 U.S. 386, 399 [2017]). While the Second Circuit has emphasized that school districts must comply with the checklist of procedures for developing a student's IEP and indicated that "[m]ultiple procedural violations may cumulatively result in the denial of a FAPE even if the violations considered individually do not" (R.E., 694 F.3d at 190-91), the Court has also explained that not all procedural errors render an IEP legally inadequate under the IDEA (M.H., 685 F.3d at 245; A.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist., 553 F.3d 165, 172 [2d Cir. 2009]; Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 381 [2d Cir. 2003]). Under the IDEA, if procedural violations are alleged, an administrative officer may find that a student did not receive a FAPE only if the procedural inadequacies (a) impeded the student's right to a FAPE, (b) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to the student, or (c) caused a deprivation of educational benefits (20 U.S.C. § 1415[f][3][E][ii]; 34 CFR 300.513[a][2]; 8 NYCRR 200.5[j][4][ii]; Winkelman v. Parma City Sch. Dist., 550 U.S. 516, 525-26 [2007]; R.E., 694 F.3d at 190; M.H., 685 F.3d at 245).

The IDEA directs that, in general, an IHO's decision must be made on substantive grounds based on a determination of whether the student received a FAPE (20 U.S.C. § 1415[f][3][E][i]). A school district offers a FAPE "by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction" (Rowley, 458 U.S. at 203). However, the "IDEA does not itself articulate any specific level of educational benefits that must be provided through an IEP" (Walczak, 142 F.3d at 130; see Rowley, 458 U.S. at 189). "The adequacy of a given IEP turns on the unique circumstances of the child for whom it was created" (Endrew F., 580 U.S. at 404). The statute ensures an "appropriate" education, "not one that provides everything that might be thought desirable by loving parents" (Walczak, 142 F.3d at 132, quoting Tucker v. Bay Shore Union Free Sch. Dist., 873 F.2d 563, 567 [2d Cir. 1989] [citations omitted]; see Grim, 346 F.3d at 379). Additionally, school districts are not required to "maximize" the potential of students with disabilities (Rowley, 458 U.S. at 189, 199; Grim, 346 F.3d at 379; Walczak, 142 F.3d at 132). Nonetheless, a school district must provide "an IEP that is 'likely to produce progress, not regression,' and . . . affords the student with an opportunity greater than mere 'trivial advancement'" (Cerra, 427 F.3d at 195, quoting Walczak, 142 F.3d at 130 [citations omitted]; see T.P., 554 F.3d at 254; P. v. Newington Bd. of Educ., 546 F.3d 111, 118-19 [2d Cir. 2008]). The IEP must be "reasonably calculated to provide some 'meaningful' benefit" (Mrs. B. v.

Milford Bd. of Educ., 103 F.3d 1114, 1120 [2d Cir. 1997]; see Endrew F., 580 U.S. at 403 [holding that the IDEA "requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances"]; Rowley, 458 U.S. at 192). The student's recommended program must also be provided in the least restrictive environment (LRE) (20 U.S.C. § 1412[a][5][A]; 34 CFR 300.114[a][2][i], 300.116[a][2]; 8 NYCRR 200.1[cc], 200.6[a][1]; see Newington, 546 F.3d at 114; Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 108 [2d Cir. 2007]; Walczak, 142 F.3d at 132).

An appropriate educational program begins with an IEP that includes a statement of the student's present levels of academic achievement and functional performance (see 34 CFR 300.320[a][1]; 8 NYCRR 200.4[d][2][i]), establishes annual goals designed to meet the student's needs resulting from the student's disability and enable him or her to make progress in the general education curriculum (see 34 CFR 300.320[a][2][i], [2][i][A]; 8 NYCRR 200.4[d][2][iii]), and provides for the use of appropriate special education services (see 34 CFR 300.320[a][4]; 8 NYCRR 200.4[d][2][v]).[2]

A board of education may be required to reimburse parents for their expenditures for private educational services obtained for a student by his or her parents, if the services offered by the board of education were inadequate or inappropriate, the services selected by the parents were appropriate, and equitable considerations support the parents' claim (Florence County Sch. Dist. Four v. Carter, 510 U.S. 7 [1993]; Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 369-70 [1985]; R.E., 694 F.3d at 184-85; T.P., 554 F.3d at 252). In Burlington, the Court found that Congress intended retroactive reimbursement to parents by school officials as an available remedy in a proper case under the IDEA (471 U.S. at 370-71; see Gagliardo, 489 F.3d at 111; Cerra, 427 F.3d at 192). "Reimbursement merely requires [a district] to belatedly pay expenses that it should have paid all along and would have borne in the first instance" had it offered the student a FAPE (Burlington, 471 U.S. at 370-71; see 20 U.S.C. § 1412[a][10][C][ii]; 34 CFR 300.148).

The burden of proof is on the school district during an impartial hearing, except that a parent seeking tuition reimbursement for a unilateral placement has the burden of proof regarding the appropriateness of such placement (Educ. Law § 4404[1][c]; see R.E., 694 F.3d at 184-85).

## VI. Discussion

### A. March 2022 IEP

#### 1. Student Needs

Although the student's present levels of performance as set forth in the March 2022 IEP are not directly in dispute—except perhaps insofar as the parent alleges that the CPSE should have additionally conducted an assistive technology assessment—a discussion thereof provides context

---

[2] The Supreme Court has stated that even if it is unreasonable to expect a student to attend a regular education setting and achieve on grade level, the educational program set forth in the student's IEP "must be appropriately ambitious in light of his [or her] circumstances, just as advancement from grade to grade is appropriately ambitious for most children in the regular classroom. The goals may differ, but every child should have the chance to meet challenging objectives" (Endrew F., 580 U.S. at 402).

for the issues to be resolved on appeal; to wit, whether the March 2022 CPSE's recommendations would have provided the student with an appropriate educational program for the 2022-23 school year.

The March 2022 CPSE convened to recommend a preschool program for the student for the 2022-23 school year (Parent Ex. B at pp. 1-2; 10-11). In addition to the district representative who served as the CPSE chairperson (CPSE chairperson), the CPSE consisted of a special education teacher/related service provider, a regular education teacher, the parent, and the parent's advocate (id. at p. 14). As reported by the CPSE chairperson, the March 2022 CPSE relied on a psychological assessment, educational evaluation, a speech-language therapy assessment, an occupational therapy (OT) assessment, and a physical therapy (PT) assessment when developing the student's IEP (Tr. p. 34; see generally Parent Ex. B at p. 2).[3]

The March 2022 IEP reflected the results of evaluations that were conducted when the student was two years nine months of age and presented as a nonverbal child with global delays in development (Parent Ex. B at pp. 2, 3). The IEP stated that, in April 2021, the student was diagnosed as having a degenerative, genetic disorder that affects the central nervous system resulting in hypotonia, spasticity, and ataxia (id. at p. 2). At the time, the student was receiving early intervention services including speech-language therapy, OT, PT, and "special instruction therapies" (id. at pp. 2, 3).

According to the March 2022 IEP, on the Bayley Scales of Infant Development – Third Edition, the student's composite scores on cognitive and speech-language scales were greater than three standard deviations below the mean indicating his functioning was within the "significantly delayed range" (Parent Ex. B at p. 2). The IEP indicated the student's adaptive behavior composite score, as measured by the Vineland Adaptive Behavior Scales, placed him in the "[l]ow" classification (id.). As related to speech and language testing, based on the Preschool Language Scales – 5 (PLS-5), the IEP indicated the student presented with severely delayed receptive and expressive language skills with a reported standard score of 50 (id.). With regard to OT, the IEP further indicated the student's scores on the Peabody Developmental Motor Scales-Second Edition (PDMS-2) placed his functioning in grasp and visual motor integration skills 3.60 standard deviations below the mean (id.). Based on the Developmental Assessment of Young Children (DAYC) adaptive scales, the student functioned 2.27 standard deviations below the mean in self-care skills (id.). In the area of PT, the student demonstrated a 65 percent delay in his motor abilities on the PDMS-2, with his gross motor skills 3.94 standard deviations below the mean (id.).

With respect to academics, the March 2022 IEP reported that the student responded to sounds, demonstrated eye contact with his parent, smiled in response to play, and mouthed all items (Parent Ex. B at p. 2). The IEP stated that the student did not identify body parts, comprehend commands, or understand the restriction "no" (id. at pp. 2-3). According to the IEP, the student recognized familiar people and responded to peek-a-boo play and being tickled (id. at p. 3). In the

---

[3] The hearing record does not include the evaluation reports referenced in the March 2022 IEP, nor did the IEP report the dates of the evaluations; according to the parent, the student was evaluated in January 2022 as part of his transition from the Early Intervention Program to the CPSE (Tr. p. 163; Parent Ex. A at p. 2; see Parent Ex. B at p. 2).

area of expressive language, the student did not "babble freely," or imitate speech sounds or words; however, he did produce vowel sounds (id.).

In the area of social development, the March 2022 IEP indicated that the student displayed a social smile and presented as a happy child; however, he did not respond to his name (Parent Ex. B at p. 3). The IEP noted that, although the student demonstrated interest in activities, and looked toward family members, he did not exhibit functional play with toys, or manipulate toys for cause and effect (id.).

Turning to the student's physical development, the March 2022 IEP described the student's degenerative neuromuscular disorder as affecting his muscle tone, postural responses, and ability to transition and move against gravity (Parent Ex. B at p. 3). The IEP noted the student's inability to follow directions, as well as immaturities in his reflex integration and in his gross and fine motor development (id.). The IEP indicated the student was dependent for most activities of daily living (ADLs) (id.). In addition, the IEP noted the student could not make his needs known to others and was dependent on others for his movement transitions and sitting balance (id.).

The CPSE recommended that, for the 2022-23 school year, the student receive 12-month programming in an 8:1+2 special class and receive three 30-minute sessions per week of group (2:1) speech-language therapy, three 30-minute sessions per week of individual OT, and three 30-minute sessions per week of individual PT (Parent Ex. B at pp. 1; 10-11). The March 2022 IEP included approximately 13 annual goals that identified the student's physical, academic, social, communication, oral motor, and sensory needs to be addressed by the teacher and/or related services providers (id. at pp. 6-9).

In addition, the March 2022 CPSE identified strategies and supports for addressing the student's management needs that included: providing manipulatives to build conceptual understanding; the use of transitional objects to increase vocabulary and sequencing; allowing ample time for verbal response to address delayed speech; encouraging the use of words to increase speech and language development; providing a quiet/calming corner to address possible frustration; providing focusing prompts with verbal reminders to stay on task; pairing verbal information with visual aids to increase comprehension; breaking down directions into steps and providing repetition as needed; repeating and reviewing previously taught concepts to increase mastery levels; providing teacher and peer praise to increase confidence; and encouraging use of hands and feet to develop fine motor skills (Parent Ex. B at p. 3-4). As related to transportation needs, the March 2022 IEP noted the student's need for special transportation, specifically a "mini bus" (id. at p. 13).

### 2. 8:1+2 Special Class Placement

On appeal, the parent contends that the IHO erred in her decision by holding that: (1) the district recommendation of an 8:1+2 special class was an appropriate fit for the student; and (2) the failure to recommend a 1:1 paraprofessional was not a denial of FAPE.

State regulations provide that a special class placement with a maximum class size not to exceed 8 students, staffed with one or more supplementary school personnel, is designed for "students whose management needs are determined to be intensive, and requiring a significant

degree of individualized attention and intervention" (8 NYCRR 200.6 [h][4][ii][b]).[4]  During the impartial hearing, the CPSE chairperson described an 8:1+2 special class setting as having eight students, one special education teacher and two assistants (Tr. p. 42).  The CPSE chairperson testified that, within the special class, the teacher had a New York State special education "license," and the assistants were "usually either paraprofessionals or teaching assistants that ha[d] some training in special education as well" (Tr. p. 42).

The CPSE chairperson testified that the teacher "[wa]s in charge of managing the entire class, but the other two adults [we]re also there to support the students" with the maximum number of students to one adult being "three" (Tr. p. 43).  The CPSE chairperson stated that the special education teacher would be "specialized in all ways to support the [student] academically" and would have "minimal" training in sensory, speech-language, and physical development in order to reinforce therapy providers lessons within the classroom (id.).  The CPSE chairperson opined that, based on the student's cognitive development and needs, information provided by the student's therapy evaluations, and the parent's input, "the eight class seemed most appropriate" (Tr. pp. 43-44).

The IEP reflects that the CPSE considered but rejected other options for the student, including related services only, special education itinerant teacher (SEIT) services with related services, and a 10-month special class program as the student's "cognitive and development de[la]ys require[d] the support of a special class 12 month program" (Parent Ex. B at p. 1).  The CPSE chairperson testified that the committee also considered a 6:1+2 special class but that the student "had a little more cognitive development as far as his ability to make eye contact and to smile with his mom and to respond than [she] would have seen for a child that [she] would have recommended for a six" (Tr. p. 52).[5]

---

[4] Supplementary school personnel "means a teacher aide or a teaching assistant" (8 NYCRR 200.1 [hh]).  A teaching assistant may provide "direct instructional services to students" while under the supervision of a certified teacher (8 NYCRR 80-5.6 [b], [c]; see also 34 CFR 200.58[a][2][i] [defining paraprofessional as "an individual who provides instructional support"]).  A "teacher aide" is defined as an individual assigned to "assist teachers" in nonteaching duties, including but not limited to "supervising students and performing such other services as support teaching duties when such services are determined and supervised by [the] teacher" (8 NYCRR 80-5.6 [b]).  State guidance further indicates that a teacher aide may perform duties such as assisting students with behavioral/management needs ("Continuum of Special Education Services for School-Age Students with Disabilities," at p. 20, Office of Special Educ. [Nov. 2013], available at http://www.p12.nysed.gov/specialed/publications/policy/continuum-schoolage-revNov13.pdf).

[5] In its answer, the district argues that the recommended 8:1+1 special class was less restrictive than a 6:1+2 special class; however, the district's position generally reflects the misplaced understanding of a student's need for additional adult support within a classroom compared to the student's placement in the LRE, which relates to the disabled student's opportunities to interact with nondisabled peers—and not a student's opportunity to interact with other disabled peers in a special class with more students in it (see R.B. v. New York City Dep't of Educ., 603 F. App'x 36, 40 [2d Cir. 2015] [explaining that the requirement that students be educated in the least restrictive environment applies to the type of classroom setting, not the level of additional support a student receives within a placement with the goal of integrating children with disabilities into the same classrooms as children without disabilities]; T.C. v. New York City Dep't of Educ., 2016 WL 1261137, at *7 [S.D.N.Y. Mar. 30, 2016] [noting that 'restrictiveness' pertains to the extent to which disabled students are educated with non-disabled students, not to the size of the student-staff ratio in special classes]).

Turning to the parent's specific argument that the student needed a 1:1 paraprofessional, State regulations regarding the recommendation of supplementary school personnel require consideration of a number of factors including: the student's management needs, goals for reducing the need for 1:1 support, the specific support the 1:1 aide would provide, other supports or accommodations, the portion of the day for which the student needs 1:1 support, staffing ratios, how the support of a 1:1 may enable the student to be educated with nondisabled peers, any potential harmful effect of having a 1:1 aide, and training and support that will be provided to the aide to help the aide understand and address the student's needs (8 NYCRR 200.4[d][3][vii]).

Generally, the CPSE chairperson noted that, within an 8:1+2 special class, the student "could be in a group of two to three students with any one adult to support his needs at any given time in the program" and as such "[the student] wouldn't be given a paraprofessional unless [he] required it" (Tr. pp. 43, 61). The chairperson opined that "[o]ftentimes when adults are sitting next to children automatically without giving them an opportunity to be independent, they begin to feel different," and if there were already three adults in the classroom who could support the student's needs the district "didn't want to automatically put a para on him" (Tr. p. 61). She indicated that she wanted the student "to have an opportunity to be as independent as possible and to feel that he could empower himself and grow unless he needed the support" (Tr. p. 64). The CPSE chairperson testified that the need for a paraprofessional was not discussed at the CPSE meeting as the recommended program would have offered "great staff with materials and a classroom environment that could support [the student]" (Tr. p. 62). Additionally, the chairperson stated that, if the student needed more support, the school could have requested this with no issues (Tr. pp. 61, 63).

The CPSE chairperson testified that the parent did not request a paraprofessional at the March 2022 CPSE meeting but that, if the parent or the school had requested one, the request would have been taken into consideration and the necessary paperwork and documentation would have been completed (Tr. pp. 61-64). In particular, the CPSE chairperson testified that medical documentation had to be submitted and the district's "Office of School Health" had to approve a health paraprofessional before the committee would "add it to the IEP" (Tr. pp. 45-46). For a "crisis" paraprofessional, the CPSE chairperson indicated that the committee would need "a teacher rationale" or other information showing the student exhibited "severe behaviors" (id.). The position of the CPSE chairperson, particularly with regard to the involvement of the office of health should be viewed in light of litigation that was brought against the district, which complained of systemic "policies that never required [the Office of School Health] or [Office of Pupil Transportation]—agencies critical to providing the services at issue in this action—to appear for IEP meetings. . . . Accordingly, Plaintiffs were required to contact OSH and OPT separately after the IEP meeting. This policy created a disjointed bureaucracy in which OSH and OPT acted in isolation without coordinating—much less knowing—the services each was required to provide" (J.L. on behalf of J.P. v. New York City Dep't of Educ., 324 F. Supp. 3d 455, 464–65 [S.D.N.Y. 2018]). The CPSE chairperson's testimony reflects a similar practice of requiring parents to file paperwork that another office within the district would examine at another time and then would, perhaps, decide if the student's IEP would be amended to include paraprofessional services. This is not the process called for under IDEA because it is the CPSE or CSE that is required to make the determination of which services should be placed on a student's IEP and it is the district's responsibility to ensure that the individuals who can make appropriate decisions are part of the CSE process. Although parents should and often do cooperate with school district personnel by

9

providing existing private medical records to the CSE , placing the onus on the parents, rather than the district to obtain medical documentation is problematic since the district may not delegate its evaluation responsibilities to the student under IDEA to the parents (see 8 NYCRR 200.4 [b][3]).

Moreover, contrary to testimony of the CPSE chairperson, the parent testified that she requested a paraprofessional for the student at the March 2022 CPSE meeting but the CPSE chairperson stated that the student did not need one (Tr. pp. 161-62, 172-73). She recalled that the CPSE chairperson said, "this is what we can do for your child" and "basically shut me down" (Tr. p. 162).

During the impartial hearing, the CPSE chairperson confirmed that the March 2022 IEP accurately identified the student's needs, specifically that the student was non-verbal, unable to follow directions, and had severe delays in gross and fine motor skills (Tr. p. 60; Parent Ex. B at p. 3). The CPSE chairperson opined that the recommended 8:1+2 special class would have provided the extra assistance the student needed to participate in the school environment (Tr. p. 60). As related to the student's dependence on others for all sitting, balance, transitions, and ADL needs, the CPSE chairperson testified that a 1:1 paraprofessional was not recommended because the classroom had materials for the student such as a "[b]oppy pillow [that] c[ould] support his ability to sit up" and "a table and for him to feel independent" (Tr. pp. 60-61).

The March 2022 IEP included other supports for the student's management needs as stated above, addressing the student's delays in speech, comprehension, attention, and confidence (Parent Ex. B at pp. 3-4). In relation to fine motor skills, the IEP listed "encourage[] use of hands and feet" to support the student's development of fine motor skills in using a pencil, picking up objects and walking around a desk (id. at p. 4). However, the IEP also noted that the student wore bilateral supramalleolar orthoses (SMO) to support his foot above the ankle bone, and that he needed specialized equipment, orthotics, and specialized transportation to go back and forth to school (id. at pp. 2, 3). Further, the IEP included goals that showed the student needed to develop basic motor skills related to "sit[ting] with support" and "reach[ing] for a toy," "improv[ing] his segmented rolling" and improving his "head righting abilities" as well as "developing oral sensory awareness and strength" (id. at pp. 6, 9).

In light of the student's dependence on others for movement transitions, ADLs, sitting balance and use of specialized equipment and orthotics, as well as the student's inability to make his needs known, I find that the district failed to meet its burden to prove that the recommended 8:1+2 special class offered the student sufficient support without 1:1 paraprofessional services and, as discussed further below, additional special transportation accommodations; accordingly, the evidence in the hearing record does not support the IHO's determination that the March 2022 IEP offered the student a FAPE.

### 3. Related Services

In the request for review, the parent argues that the district failed to recommend appropriate related services and failed to recommend related services in the appropriate frequency and duration. Before turning to the parent's specific arguments, I note that the parent's claims pertaining to related services, as well as assistive technology and transportation, focus on a comparison of iBrain's recommendations for the student for the 2022-23 school year. However,

the iBrain educational plan and recommendations for 60-minute sessions, assistive technology and assistive technology services, and music therapy were not available to the March 2022 CPSE and, therefore, may not be relied upon to invalidate the IEP (see C.L.K. v. Arlington Sch. Dist., 2013 WL 6818376, at *13 [S.D.N.Y. Dec. 23, 2013] [finding that "a substantively appropriate IEP may not be rendered inadequate through testimony and exhibits that were not before the CSE about subsequent events . . . that seek to alter the information available to the CSE"]; see also J.M. v New York City Dep't of Educ., 2013 WL 5951436, at *18-*19 [S.D.N.Y. Nov. 7, 2013] [holding that a progress report created subsequent to the CSE meeting may not be used to challenge the appropriateness of the IEP]; F.O. v New York City Dep't of Educ., 976 F.Supp.2d 499, 513 [S.D.N.Y. 2013] [refusing to consider subsequent year's IEP as additional evidence because it was not in existence at time IEP in question was developed]).[6]

Further, comparisons of a unilateral placement to the public placement are not a relevant inquiry when determining whether the district offered the student a FAPE; rather it must be determined whether or not the district established that it complied with the procedural requirements set forth in the IDEA and State regulations with regard to the specific issues raised in the due process complaint notice, and whether the IEP developed by its CPSE through the IDEA's procedures was substantively appropriate because it was reasonably calculated to enable the student to receive educational benefits—irrespective of whether the parent's preferred program was also appropriate (Rowley, 458 U.S. at 189, 206-07; R.E., 694 F.3d at 189-90; M.H., 685 F.3d at 245; Cerra, 427 F.3d at 192; Walczak, 142 F.3d at 132; see R.B. v. New York City Dep't. of Educ., 2013 WL 5438605 at *15 [S.D.N.Y. Sept. 27, 2013] [explaining that the appropriateness of a district's program is determined by its compliance with the IDEA's requirements, not by its similarity (or lack thereof) to the unilateral placement], aff'd, 589 Fed. App'x 572 [2d Cir. Oct. 29, 2014]; M.H. v. New York City Dep't. of Educ., 2011 WL 609880, at *11 [S.D.N.Y. Feb. 16, 2011] [finding that "'the appropriateness of a public school placement shall not be determined by comparison with a private school placement preferred by the parent'"], quoting M.B. v. Arlington Cent. Sch. Dist., 2002 WL 389151, at *9 [S.D.N.Y. Mar. 12, 2002]; see also Angevine v. Smith, 959 F.2d 292, 296 [D.C. Cir. 1992] [noting the irrelevancy comparisons that were made of a public school and unilateral placement]; B.M. v. Encinitas Union Sch. Dist., 2013 WL 593417, at *8 [S.D. Cal. Feb. 14, 2013] [noting that "'[e]ven if the services requested by parents would better serve the student's needs than the services offered in an IEP, this does not mean that the services offered are inappropriate, as long as the IEP is reasonably calculated to provide the student with educational benefits'"], quoting D.H. v. Poway Unified Sch. Dist., 2011 WL 883003, at *5 [S.D. Cal. Mar. 14, 2011]).

With this in mind, I turn to the parent's specific arguments.

### a. Duration of Related Services

The March 2022 CPSE recommended related services sessions that were 30-minutes in duration (Parent Ex. B at p. 10). Specifically, as summarized above, the IEP mandated the following related services on a weekly basis in an early childhood program selected by the parent:

---

[6] On September 23, 2022, iBrain created a document titled "Recommended Individualized Education Plan (IEP)" which it updated on February 28, 2023 (see Parent Ex. G). As this document is not an official IEP created by a CSE or CPSE, for the sake of clarity it shall be referenced throughout this decision as "iBrain educational plan".

three sessions of group (2:1) speech-language therapy; three sessions of individual OT; and three sessions of individual PT (id.).

In contrast to the CPSE's recommendations, the 2022-23 iBrain educational plan—which as noted above was not before the CPSE—recommended related services sessions that were 60-minutes in duration (Parent Ex. G at pp. 39-40). During the impartial hearing, the director of special education at iBrain (iBrain director) testified that the student had "global deficits in . . . PT, OT, speech" and that "the 60-minute sessions provide[d] the time necessary to adjust the depth and breadth of... the needs that he ha[d], but also the 60-minute sessions [we]re necessary because he need[ed] . . . to get the practices and the trials in of these skills with the therapist" (Tr. pp. 132-33). The iBrain director noted that the student was unable to remember and practice skills on his own and therefore he needed "that additional time so that he can get the practices in when he's actually in the sessions" in order for him "to progress" (Tr. p. 135). The iBrain director further testified that 60-minute sessions were necessary because the student had many areas of deficit in each discipline, whereas other students who were working on a discrete skill might not need as much time (Tr. pp. 131-32). She noted, for example, that if the student's PT sessions were reduced to 30 minutes the student would either be unable to engage in the physical and sensory activities that prepared him to work on functional motor tasks or unable to work on the functional motor tasks themselves (Tr. p. 136-37).

However, the district's CPSE chairperson testified that in her experience "when kids have services beyond . . . 30 minutes . . . they become overwhelmed and no longer want to engage. They're unable to keep up and retain the information presented to them" (Tr. p. 76). She noted that children with severe disabilities, but also children in general, had short attention spans and "[p]utting them in a classroom beyond 30 minutes for therapy is overwhelming" (Tr. p. 76). With regard to the student, the CPSE chairperson testified that in her professional opinion "[60-minute sessions were] too much time for [the student] knowing that he already c[ould]not do all of these activities independently. He should start off with a minimal amount of time. And then if he needs more time, once he can endure the initial 30 minutes, then increase. But to just do 60-minute sessions . . . this is overwhelming" (Tr. pp. 99-100). The CPSE chairperson opined that, during the student's therapies, "he's working out. He's moving. He's exercising. That is strenuous on an adult, imagine a child who already has a disorder, a [de]generative disorder" (Tr. p. 100).[7]

The CPSE chairperson acknowledged that the student needed a lot of preparation time and also required a lot of repetition in order to learn a skill (Tr. p. 91). She stated that the student was "not going to achieve [an] entire objective in 30 minutes but that's what the repetition is for" (Tr. p. 91). She pointed out that the student was not recommended for one 30-minute session of a particular related service per week, but rather he was recommended for three sessions (Tr. p. 91). The CPSE chairperson noted that the student would be in "a full day program of support in addition to the therapy" (Tr. p. 91).

---

[7] The CPSE chairperson further opined that with 60-minute therapy sessions the student did not have "the opportunity to learn anything other than his therapies" (Tr. p. 99). She indicated that a typical day was five to six hours, and the student was being "pulled out" for three hours, which only left time for him to nap and eat (Tr. p. 99). She suggested that the student did not have time to build social interactions or learn in the classroom (Tr. p. 99).

Testimony by the iBrain director shows that iBrain chose to focus more on individual therapies and less on classroom instruction and socialization, while testimony by the CPSE chairperson shows that the public school program chose to emphasize classroom instruction and socialization over individual therapies. Although iBrain chose to balance the student's complex needs differently than the district, this does not make the district's recommendations for shorter therapy session inappropriate when viewing the recommended program as a whole, particularly as iBrain's recommendations were not before the CPSE. Accordingly, there is insufficient basis in the hearing record to disturb the IHO's determination that the 30-minute related service sessions were appropriate to address the student's unique needs (IHO Decision at p. 9).

### b. Music Therapy

As related to music therapy, the iBrain educational plan, which, as noted above, was not available to the March 2022 CPSE, included a recommendation that the student receive two 60-minute sessions per week of individual music therapy and one 60-minute session per week of group music therapy (Parent Ex. G at p. 39). The iBrain educational plan included a rationale for music therapy that stated the student "appear[ed] to enjoy and benefit from music therapy" and that music therapy "appear[ed] to be a great motivator" for the student and had the potential to help him with his communication, motor skills, and socialization (id. at p. 31). However, the iBrain educational plan noted that "it d[id] not appear that [the student] need[ed] [music therapy] to maintain regulation" (id.).

Turning to the district's recommendation, an IEP must include a statement of the related services recommended for a student based on such student's specific needs (8 NYCRR 200.6[e]; see 20 U.S.C. § 1414[d][1][A][i][IV]; 34 CFR 300.320[a][4]). "Related services" is defined by the IDEA as "such developmental, corrective, and other supportive services . . . as may be required to assist a child with a disability to benefit from special education" and includes psychological services as well as "recreation, including therapeutic recreation" (20 U.S.C. § 1401[26][A] [emphasis added]; see 34 CFR 300.34[a]; 8 NYCRR 200.1[qq]).

The March 2022 IEP did not include a recommendation for music therapy services (Parent Ex. B at p. 10). However, there is no indication that information available to and before the CPSE included a recommendation for music therapy or otherwise indicated that the student required such a service to benefit from special education. And, the parent's contention that the student showed "great progress with Music Therapy" during the 2022-23 school year, after the March 2022 CPSE, may not be relied upon to invalidate the recommendations set forth in the IEP. Thus, there is no basis to disturb the IHO's decision that the absence of music therapy did not deny the student a FAPE.

### 4. Assistive Technology

On appeal, the parent argues that the March 2022 CPSE failed to conduct an assistive technology evaluation or recommend an assistive technology device or services on the IEP to address the student's communication needs.

While it was not available to the March 2022 CPSE, the parent again points to the 2022-23 iBrain educational plan and its recommendation that the student receive one 60-minute session

per week of individual assistive technology services (Parent Ex. G at p. 40). At the time of the impartial hearing, the assistive technology provider for iBrain testified that the student was trialing mid and low technology augmentative communication that included symbols and a single-voice output switch (Tr. p. 213). Within direct testimony by affidavit, the assistive technology provider reported that the student was trialing a "high tech speech generating device" as well (Parent Ex. I ¶ 8). During the impartial hearing, the assistive technology provider testified that "yes, there can be progress" in the absence of assistive technology services, stating that "[augmentative and alternative communication (AAC)] with just low tech would involve just symbols" (Tr. p. 215).

Under the IDEA, a CSE may be required to consider special factors in the development of a student's IEP. One of the special factors that a CSE must consider is whether the student "requires assistive technology devices and services, including whether the use of school-purchased assistive technology devices is required to be used in the student's home or in other settings in order for the student to receive a [FAPE]" (8 NYCRR 200.4[d][3][v]; see 20 U.S.C. § 1414[d][3][B][v]; 34 CFR 300.324[a][2][v]; see also Educ. Law § 4401[2][a]). The failure to recommend specific assistive technology devices and services rises to the level of a denial of a FAPE only if such devices and services are required for the student to access his educational program (see, e.g., Application of the Bd. of Educ., Appeal No. 13-214; Application of a Student with a Disability, Appeal No. 11-121).

With regard to assistive technology, the CPSE chairperson testified that, if the student was not making progress in the classroom with the supports given then assistive technology could be helpful (Tr. p. 72). However, she explained that, if the student was able to pick up on the cues, such as modeled behavior of other children and was able to use the pictures, books, manipulatives, resources and reinforcement in the classroom, he would not need assistive technology (Tr. p. 72).

Although the March 2022 IEP did not require the provision of an assistive technology device or service, the IEP included a short-term objective that specified the student would use a "simple device (i.e. big mac) to make requests" (Parent Ex. B at pp. 5, 8). Further, to address, the student's communication needs, the March 2022 CPSE recommended that the student receive three 30-minute sessions of speech-language therapy in a group (2:1) and supports for management needs, such as giving the student time for verbal responses, encouragement for the student to use words, as well as an annual goal focused on increasing the student's vocal imitation and communication skills with short term objectives that, in addition to providing for the student's use of a simple device to communicate, also contemplated that the student would work on vocalizations given oral stimulation, engage in vocal play and imitate vocalizations, and, with prompting, use sign/gestures to make requests (id. at pp. 3-4, 8, 10).

Based on the foregoing, there is no indication that information available to the CPSE recommended an assistive technology device or services or that the CPSE's recommendations for communication supports that did not utilize "high tech" contributed to a denial of a FAPE in this instance.

### 5. Transportation and Transportation Paraprofessional

In her decision, the IHO noted that "[t]he [d]istrict was aware that the [s]tudent is non-verbal and non-ambulatory, accordingly, a lift bus should have been recommended with at least

one paraprofessional present on the bus, to address the [s]tudent's needs" but credited the district witness who testified that the district could "make an adjustment to transportation if necessary" (IHO Decision at p. 10).    The IHO held "[d]espite the deficiencies with the [d]istrict's transportation recommendations this alone does not demonstrate a denial of FAPE" (id.).    The parent appeals the IHO's determination that the insufficient transportation recommendations did not amount to a denial of a FAPE.

The IDEA specifically includes transportation, as well as any modifications or accommodations necessary in order to assist a student to benefit from his or her special education, in its definition of related services (20 U.S.C. § 1401[26]; see 34 CFR 300.34[a], [c][16]).    In addition, State law defines special education as "specially designed instruction . . . and transportation, provided at no cost to the parents to meet the unique needs of a child with a disability," and requires school districts to provide disabled students with "suitable transportation to and from special classes or programs" (Educ. Law §§ 4401[1]; 4402[4][a]; see Educ. Law § 4401[2]; 8 NYCRR 200.1[ww]).    Specialized forms of transportation must be provided to a student with a disability if necessary for the student to benefit from special education, a determination which must be made on a case-by-case basis by the CSE (Irving Indep. Sch. Dist. v. Tatro, 468 U.S. 883, 891, 894 [1984]; Dist. of Columbia v. Ramirez, 377 F. Supp. 2d 63 [D.D.C. 2005]; see Transportation, 71 Fed. Reg. 46576 [Aug. 14, 2006]; "Questions and Answers on Serving Children with Disabilities Eligible for Transportation," 53 IDELR 268 [OSERS 2009]; Letter to Hamilton, 25 IDELR 520 [OSEP 1996]; Letter to Anonymous, 23 IDELR 832 [OSEP 1995]; Letter to Smith, 23 IDELR 344 [OSEP 1995]).    If the student cannot access his or her special education without provision of a related service such as transportation, the district is obligated to provide the service, "even if that child has no ambulatory impairment that directly causes a 'unique need' for some form of specialized transport" (Donald B. v. Bd. of Sch. Commrs., 117 F.3d 1371, 1374-75 [11th Cir. 1997] [emphasis in original]).    The transportation must also be "reasonable when all of the facts are considered" (Alamo Heights Indep. Sch. Dist. v. State Bd. of Educ., 790 F.2d 1153, 1160 [5th Cir. 1986]).

For school aged children, according to State guidance, the CSE should consider a student's mobility, behavior, communication, physical, and health needs when determining whether or not a student requires transportation as a related service, and the IEP "must include specific transportation recommendations to address each of the student's needs, as appropriate," which may include special seating, vehicle and/or equipment needs, adult supervision, type of transportation, and other accommodations ("Special Transportation for Students with Disabilities," VESID Mem. [Mar. 2005], available at http://www.p12.nysed.gov/specialed/publications/policy/ specialtrans.pdf).    Other relevant considerations may include the student's age, ability to follow directions, ability to function without special transportation, the distance to be traveled, the nature of the area, and the availability of private or public assistance (see Donald B., 117 F.3d at 1375; Malehorn v. Hill City Sch. Dist., 987 F. Supp. 772, 775 [D.S.D. 1997]).    For preschool students with a disability, State regulations provide that "[i]n developing its recommendation for a preschool student with a disability to receive programs and services, the committee must identify transportation options for the student and encourage parents to transport their child at public expense where cost-effective" (8 NYCRR 200.16 [e][5]).[8]    However, in general it is not uncommon

---

[8] For preschool students with disabilities "[t]he municipality in which a preschool student resides is responsible

for parents to continue to transport their three- and four-year-old children to daycare and preschool programs themselves.

Here, the March 2022 CPSE recommended a minibus for the student's special transportation needs (Parent Ex. A at p. 13). The chairperson indicated that this meant the student would travel on "a bus with only preschoolers" (Tr. p. 80). However, within the present levels of performance section, the March 2022 IEP noted that the student "is dependent in most ADL skills and will need specialized equipment, orthotics and a specialized transportation chair to go back and forth to a school program" and stated that the student "is dependent on others for his movement transitions, sitting balance and ADL abilities" (Parent Ex. A at p. 3). When questioned during the impartial hearing about additional support for transportation, the chairperson testified that, if the parent sent the student to the recommended program and requested other transportation support and if the student was in a wheelchair, the CPSE "would have adjusted and supported the student" (Tr. pp. 80-81).

Retrospective testimony about actions a school district would have taken to amend a student's IEP in order to address a student's needs may not be relied upon to rehabilitate a deficient IEP, as "[a]t the time the parents . . . choose whether to accept the school district recommendation or to place the child elsewhere, they have only the IEP to rely on" (R.E., 694 F.3d at 186). As the hearing record is not entirely clear regarding what information was before the CSE about the student's transportation needs, it is not possible to assess whether the IHO reached an appropriate conclusion in finding that the that the student required a bus with a lift and a transportation paraprofessional in particular because the hearing record contained conflicting information.[9] It is sufficient to say that the district did not meet its burden to prove that it engaged in the requisite planning at the time of the CPSE meeting to address the student's individual transportation needs and, therefore, it contributes to the within finding that the district denied the student a FAPE for the 2022-23 school year.

### B. Unilateral Placement

Having found that the district failed to offer the student a FAPE, the next issue to be discussed is whether iBrain was an appropriate unilateral placement for the student for the 2022-23 school year. As the IHO determined that the district had provided the student with a FAPE for the 2022-23 school year, she declined to address the appropriateness of iBrain as a unilateral

---

to provide suitable transportation, as determined by the board of education" ("Reimbursement to Counties for Transportation Costs for Preschool Students with Disabilities [Revised from June 2002]," Office of Special Educ. Memo [August 2011], available at https://www.p12.nysed.gov/specialed/publications/preschooltrans-811.pdf)

[9] While it was not available to the March 2022 CPSE, I note that the iBrain educational plan specified that the student needed a transportation paraprofessional, a wheelchair, and a "lift-bus/wheelchair ramp" (Parent Exs. F at p. 2; G at p. 38). However, it is noted in the iBrain educational plan that the student "utilizes a commercial stroller to access home and community environments" and that the student "travels in a car seat" (Parent Ex. G at p. 5). The hearing record does not sufficiently indicate that the student actually used a wheelchair at the time of the March 2022 CPSE thereby warranting a recommendation for a bus with a wheelchair ramp or lift in particular.

placement (IHO Decision at p. 10). For the reasons discussed below, the question must be remanded to the IHO.

A private school placement must be "proper under the Act" (Carter, 510 U.S. at 12, 15; Burlington, 471 U.S. at 370), i.e., the private school offered an educational program which met the student's special education needs (see Gagliardo, 489 F.3d at 112, 115; Walczak, 142 F.3d at 129). A parent's failure to select a program approved by the State in favor of an unapproved option is not itself a bar to reimbursement (Carter, 510 U.S. at 14). The private school need not employ certified special education teachers or have its own IEP for the student (Carter, 510 U.S. at 13-14). Parents seeking reimbursement "bear the burden of demonstrating that their private placement was appropriate, even if the IEP was inappropriate" (Gagliardo, 489 F.3d at 112; see M.S. v. Bd. of Educ. of the City Sch. Dist. of Yonkers, 231 F.3d 96, 104 [2d Cir. 2000]). "Subject to certain limited exceptions, 'the same considerations and criteria that apply in determining whether the [s]chool [d]istrict's placement is appropriate should be considered in determining the appropriateness of the parents' placement'" (Gagliardo, 489 F.3d at 112, quoting Frank G. v. Bd. of Educ. of Hyde Park, 459 F.3d 356, 364 [2d Cir. 2006]; see Rowley, 458 U.S. at 207). Parents need not show that the placement provides every special service necessary to maximize the student's potential (Frank G., 459 F.3d at 364-65). When determining whether a unilateral placement is appropriate, "[u]ltimately, the issue turns on" whether the placement is "reasonably calculated to enable the child to receive educational benefits" (Frank G., 459 F.3d at 364; see Gagliardo, 489 F.3d at 115; Berger v. Medina City Sch. Dist., 348 F.3d 513, 522 [6th Cir. 2003] ["evidence of academic progress at a private school does not itself establish that the private placement offers adequate and appropriate education under the IDEA"]). A private placement is appropriate if it provides instruction specially designed to meet the unique needs of a student (20 U.S.C. § 1401[29]; Educ. Law § 4401[1]; 34 CFR 300.39[a][1]; 8 NYCRR 200.1[ww]; Hardison v. Bd. of Educ. of the Oneonta City Sch. Dist., 773 F.3d 372, 386 [2d Cir. 2014]; C.L. v. Scarsdale Union Free Sch. Dist., 744 F.3d 826, 836 [2d Cir. 2014]; Gagliardo, 489 F.3d at 114-15; Frank G., 459 F.3d at 365).

The Second Circuit has set forth the standard for determining whether parents have carried their burden of demonstrating the appropriateness of their unilateral placement.

> No one factor is necessarily dispositive in determining whether parents' unilateral placement is reasonably calculated to enable the child to receive educational benefits. Grades, test scores, and regular advancement may constitute evidence that a child is receiving educational benefit, but courts assessing the propriety of a unilateral placement consider the totality of the circumstances in determining whether that placement reasonably serves a child's individual needs. To qualify for reimbursement under the IDEA, parents need not show that a private placement furnishes every special service necessary to maximize their child's potential. They need only demonstrate that the placement provides educational instruction specially designed to meet the unique needs of a handicapped child, supported by such services as are necessary to permit the child to benefit from instruction.

17

(Gagliardo, 489 F.3d at 112, quoting Frank G., 459 F.3d at 364-65).

The 2022-23 iBrain educational plan recommended that the student attend a 12-month program in a 6:1+1 special class, with a 1:1 paraprofessional throughout the day, and receive related services that included: five 60-minute sessions per week of individual OT, five 60-minute sessions per week of individual PT, five 60-minute sessions per week of individual speech-language therapy, two 60-minute sessions per week of individual music therapy, one 60-minute session per week of group music therapy, and one 60-minute session per week of individual assistive technology services (Parent Ex. G at pp. 39-40).[10]

In her affidavit testimony, the iBrain director of special education (iBrain director) described iBrain as a "highly specialized special education program" for students with acquired brain injuries or brain-based disabilities (Parent Ex. H ¶ 5). The iBrain director stated that iBrain provided students with educational programs focused on improving functional skills appropriate to each student's cognitive, physical, and developmental levels (id. ¶ 7). She testified that iBrain provided a "collaborative and multi-disciplinary approach" that incorporated "best practices" from the medical, clinical, and educational fields (id.). In her affidavit testimony, iBrain's director stated that the student's classification of traumatic brain injury "warrant[ed] the use of a direct instruction model and inform[ed] the clinical approach taken throughout the interdisciplinary program" as provided through related services (id. ¶ 10). The iBrain director explained that related services were provided using a push-in, pull-out model, "which was critical for students with brain injuries because they have a severe deficit in their ability to generalize skills" (id. ¶ 8). She indicated that the model prevented student's from becoming reliant on context clues so that the skills being taught "could actually be functionally useful" (Tr. pp. 138-40).

While the appropriateness of the iBrain educational plan is not materially at issue, evidence adduced at the impartial hearing brings into question iBrain's implementation of the student's related services for the 2022-23 school year.[11] The iBrain educational plan for the student for the

---

[10] The 2022-23 iBrain educational plan recommended parent counseling and training to be provided monthly; however, the frequency of individual/group sessions per month was not listed (Parent Ex. G at p. 39).

[11] With respect to the appropriateness of the educational plan developed for the student at iBrain, in its closing brief, the district argued that "[t]he record d[id] not contain any testimony, via affidavit or otherwise, from a person with first-hand knowledge of iBrain's program for the student" (IHO Ex. II at p. 13). However, the hearing record included the written plan developed by iBrain for the student (Parent Ex. G). To the extent the district's argument was that the iBrian educational plan was not authenticated by testimony, the formal rules of evidence applicable in civil actions generally do not apply in impartial hearings (see H.C. v. Katonah-Lewisboro Union Free Sch. Dist., 528 Fed. App'x 64, 68 [2d Cir. June 24, 2013] [citing Richardson v. Perales, 402 U.S. 389, 400 (1971) for the proposition that the strict rules of evidence do not apply in an administrative proceeding and noting that application of the Daubert gatekeeper requirement is highly questionable in IDEA proceedings]; Council Rock Sch. Dist. v. M.W., 2012 WL 3055686, at *6 [E.D. Pa. July 26, 2012]; Matos v. Hove, 940 F. Supp. 67, 72 [S.D.N.Y. Sept. 25, 1996], citing Silverman v. Commodity Futures Trading Comm'n, 549 F.2d 28, 33 [7th Cir. 1977]; Cowan v. Mills, 34 A.D.3d 1166, 1167 [3d Dep't 2006]; Tonette E. v. New York State Office of Children and Family Servs., 25 A.D.3d 994, 995-96 [3d Dep't 2006]). This is in part because the "IDEA hearings are deliberately informal and intended to give [hearing officers] the flexibility that they need to ensure that each side can fairly present its evidence" (Schaffer, 546 U.S. at 61). At most, the lack of testimony pertaining to the iBrain educational plan may warrant affording the document less weight overall given the totality of the evidence. Weighing the evidence, the inclusion of the detailed written plan included in evidence would likely be sufficient

2022-23 school year called for related services in the areas of OT, PT, speech-language therapy, music therapy and assistive technology to begin on September 8, 2022 (Parent Ex. G at p. 39). The iBrain director provided direct testimony in general terms that the student had attended iBrain since September 2022 and received the related services as detailed above in his 2022-23 iBrain educational plan within the 6:1+1 special class along with the provision of a 1:1 paraprofessional throughout the day (compare Parent Ex. G at pp. 39-40, with Parent Ex. H ¶¶ 9, 11-14).[12]  However, during cross examination at the impartial hearing, the iBrain director admitted that iBrain was short on providers in most disciplines resulting in students missing related service sessions (Tr. p. 153).

Specific to the student, the iBrain director provided a vague and general recollection of information about the student's related services.[13]  During the impartial hearing, the iBrain director testified that she had observed the student in an academic session a month ago, could not recall with certainty the student's related service providers, and, when asked if she had observed the student in any of his related therapies, the iBrain director recalled observing the student in an assistive technology service session and "a while back in an OT session" (Tr. pp. 141, 143-44).

With respect to the delivery of the student's related services, the iBrain director testified "at least he's getting a few sessions" but added that he was likely "missing . . . one or two sessions a week" but that she did not "know specifically" (Tr. p. 154).  The iBrain director did not specify the disciplines for which the student was missing related services sessions nor did she indicate if the student was only receiving "a few sessions" total per week rather than the 19 weekly sessions across disciplines as indicated on the iBrain educational plan (Tr. pp. 153-54; Parent Ex. G at pp. 39-40).  As of the impartial hearing date on April 17, 2023, the iBrain director testified that the student still needed make up sessions for missed related service sessions (Tr. p. 155).  When questioned regarding the effects of missing related service sessions in relation to the student's ability to make progress, the iBrain director noted the importance of making up all sessions stating that "they [we]re critical" (Tr. p. 155).  The iBrain director reported that new providers recently started at iBrain, and some students were provided makeup visits over school breaks; however, the student did not receive these makeup sessions (Tr. pp. 154-55).[14]

---

to establish the appropriateness of the program and services intended for the student; on the other hand, the lack of testimony from an individual with first-hand knowledge may be problematic on the question of the implementation of that plan after the document was written, to the extent delivery of the services is at issue.

[12] The iBrain director's affidavit contained two paragraphs numbered 14; the first paragraph 14 is cited herein.

[13] The iBrain director testified that as she did not oversee the related services at iBrain and she did not know specifics related to the student; on the other hand, in her affidavit testimony, she described that, part of her role as director included "implementation of IEPs" (Tr. p. 154; Parent Ex. H ¶ 1).

[14] Only the provider who delivered the student's assistive technology services testified in this matter, noting that, as of the date of her testimony in April 2023, she had provided services to the student for "approximately [three] months" (Parent Ex. I ¶ 6).  The iBrain educational plan reflected a start date of September 8, 2022 for all related services including assistive technology services; the assistive technology services provider did not indicate if the student had received prior services in assistive technology in accordance with the student's iBrain educational plan (see generally Parent Ex. I).

As noted above, the education plan at iBrain favored a heavier emphasis on the provision of special education services through related services and accommodations and iBrain's education plan was designed accordingly which became problematic when faced with a shortage of related service providers (see Parent Ex. G at pp. 39-40).[15] However, the hearing record lacks specific information regarding the number of related service sessions missed due to the shortage of providers at iBrain, the disciplines for which the student missed services, and whether, at the time of the impartial hearing, related service providers were secured to provide the student's recommended related services in all disciplines (Tr. pp. 154-55). As of the April 17, 2023 hearing date, the iBrain director testified that "all of the sessions" would be made-up (Tr. p. 153).

Based on the foregoing, while the 2022-23 iBrain educational plan may have been adequate, the iBrain director acknowledged that the student had not received all of the related services in accordance with iBrain's recommendations. Given that a very large portion of the student's iBrain educational plan consisted of related services, their omission may be detrimental to a finding that iBrain provided a program specially designed to meet the unique needs of the student. However, the hearing record is insufficiently developed regarding the degree to which iBrain failed to deliver the student's related services. Moreover, as the IHO did not address the appropriateness of iBrain, I am also without the benefit of the IHO's findings and determinations on the issues at hand to review.

### C. Remand

When an IHO has not addressed claims set forth in a due process complaint notice, an SRO may consider whether the case should be remanded to the IHO for a determination of the claims that the IHO did not address (8 NYCRR 279.10[c]; see Educ. Law § 4404[2]; F.B. v. New York City Dep't of Educ., 923 F. Supp. 2d 570, 589 [S.D.N.Y. 2013] [indicating that the SRO may remand matters to the IHO to address claims set forth in the due process complaint notice that were unaddressed by the IHO], citing J.F. v. New York City Dep't of Educ., 2012 WL 5984915, at *9 n.4 [S.D.N.Y. Nov. 27, 2012]; see also D.N. v. New York City Dep't of Educ., 2013 WL 245780, at *3 [S.D.N.Y. Jan. 22, 2013]). Here, while I considered making a determination about the appropriateness of the unilateral placement, given the fact that I have determined that 30-minute related services would not deny the student a FAPE as well as the concerns described above with the implementation of the iBrain educational plan, the hearing record is insufficiently developed to make a decision.

As I have indicated in the past, prehearing conferences are a useful and important opportunity, not only to clarify the issues underlying a parent's allegation that a district denied a student a FAPE, but also to ascertain which issues are disputed about the unilateral placement (see 8 NYCRR 200.5[j][3][xi][a] [identifying one purpose of a prehearing conference as "simplifying and clarifying the issues"]). Further issue clarification and hearing management may be accomplished using tools such as requiring parties to submit prehearing memorandums of law, to

---

[15] The irony of the parent accusing the district of having inadequate related services is not lost upon the undersigned when the parent's preferred private placement may not have fared much better, but because the district did not deny the student a FAPE due to a lesser amount related services than those called for in the iBrain plan, I will allow the parent the opportunity to be heard upon remand that less related services than called for by the iBrain plan would nevertheless be sufficient to enable the student to receive educational benefits.

present opening statements with specific issue identification instead of broad statements of the parties' positions, and provision of disclosures before the start of the impartial hearing to ensure that parties can identify disputed areas of fact and be on notice of the issues to be addressed during the impartial hearing (see, e.g., Application of a Student with a Disability, Appeal No. 23-121).[16] Here, the IHO held a prehearing conference but did not clarify the fact issues to be resolved with respect to the unilateral placement and, as a result, the hearing record was not sufficiently developed on the question of the delivery of related services at iBrain.

Accordingly, the IHO's decision must be reversed, and the matter remanded to the IHO for further proceedings relating to relief sought by the parent in the December 6, 2022 due process complaint notice, including whether iBrain was an appropriate unilateral placement for the student and whether the equitable considerations weigh in favor of an award of tuition funding. Upon remand, the IHO shall fully develop the hearing record on each issue that must be ruled upon. On the issue of delivery of related services at iBrain, this should include, for example, testimony and/or progress reports from iBrain related services providers and related services delivery reports from iBrain; if the parent does not offer this information, the district may wish to request subpoenas, which the IHO has the authority to issue if necessary (see 8 NYCRR 200.5[j][3][iv]).[17]

**D. Independent Educational Evaluation**

The district cross-appeals the IHO's order for an independent neuropsychological evaluation at public expense, contending that, other than in the parent's due process complaint notice, the hearing record does not contain evidence of a request from the parent for an IEE.

The IDEA and State and federal regulations guarantee parents the right to obtain an IEE (see 20 U.S.C. § 1415[b][1]; 34 CFR 300.502; 8 NYCRR 200.5[g]), which is defined by State regulation as "an individual evaluation of a student with a disability or a student thought to have a disability, conducted by a qualified examiner who is not employed by the public agency responsible for the education of the student" (8 NYCRR 200.1[z]; see 34 CFR 300.502[a][3][i]). Parents have the right to have an IEE conducted at public expense if the parent expresses disagreement with an evaluation conducted by the district and requests that an IEE be conducted at public expense (34 CFR 300.502[b]; 8 NYCRR 200.5[g][1]; see K.B. v Pearl Riv. Union Free Sch. Dist., 2012 WL 234392, at *5 [S.D.N.Y. Jan. 13, 2012] [noting that "a prerequisite for an IEE is a disagreement with a specific evaluation conducted by the district"]; R.L. v. Plainville Bd. of Educ., 363 F. Supp. 2d. 222, 234-35 [D. Conn. 2005] [finding parental failure to disagree with an evaluation obtained by a public agency defeated a parent's claim for an IEE at public expense]). The Second Circuit Court of Appeals has recently found that, if a district and a parent agree that a

---

[16] For example, during its opening statement, rather than identifying particular issues with the unilateral placement such as the concern about delivery of services, the district broadly stated: " It is the . . . Parent's burden to prove that the unilateral placement is appropriate. It is the District's position . . . that the unilateral placement iBRAIN is not appropriate, as it is not sufficiently calculated to meet the student's unique educational needs" (Tr. p. 28). Those are merely conclusory statements regarding the Rowley and Burlington/Carter standards that apply to virtually all tuition reimbursement cases.

[17] Similarly, I leave it to the IHO's sound discretion to determine if there are any factual disputes to be resolved related to the appropriate design or actual delivery of private special transportation services obtained by the parent from Sisters Travel and Transportation Services, LLC (see Parent Ex. F).

student should be evaluated before the required triennial evaluation "the parent must disagree with any given evaluation before the child's next regularly scheduled evaluation occurs" or "[o]therwise, the parent's disagreement will be rendered irrelevant by the subsequent evaluation" (D.S. v. Trumbull Bd. of Educ., 975 F.3d 152, 170 [2d Cir. 2020]).

If a parent requests an IEE at public expense, the school district must, without unnecessary delay, either (1) ensure that an IEE is provided at public expense; or (2) initiate an impartial hearing to establish that its evaluation is appropriate or that the evaluation obtained by the parent does not meet the school district criteria (34 CFR 300.502[b][2][i]-[ii]; 8 NYCRR 200.5[g][1][iv]). If a school district's evaluation is determined to be appropriate by an IHO, the parent may still obtain an IEE, although not at public expense (34 CFR 300.502[b][3]; 8 NYCRR 200.5[g][1][v]). Additionally, both federal and State regulations provide that "[a] parent is entitled to only one [IEE] at public expense each time the public agency conducts an evaluation with which the parent disagrees" (34 CFR 300.502[b][5]; 8 NYCRR 200.5[g][1]).

Here, there is no evidence that the parent sought IEEs at public expense prior to initiating due process with the December 2022 due process complaint notice or how the district responded, if at all, to the parent's request. The parent alleged in her December 2022 due process complaint notice that the district did not adequately evaluate the student in all areas of disability and that the student required a neuropsychological evaluation due to the "complex nature of [the student's] brain-based disorder" (Parent Ex. A at p. 3). The parent did not specify a particular evaluation or reevaluation conducted by the district with which she disagreed (id.). During the impartial hearing, the CPSE chairperson testified that the July 2022 CPSE reviewed "a psychological assessment, an educational evaluation, a speech-language therapy assessment, an occupational therapy assessment, and a physical therapy assessment" and that it was her professional belief that the IEP team had sufficient information during the CPSE (Tr. p. 34). In granting the parent's request for an IEE at public expense, the IHO noted that "[t]he IEP was based largely upon a psychological assessment, OT, SLT and PT assessments," and that "the [p]arent believe[d] that these evaluations failed to adequately assess the [s]tudent's needs" (IHO Decision at p. 11). The IHO did not examine if the parent's request for IEEs for the first time in the due process complaint notice was sufficient or, for that matter, whether the district evaluation of the student was adequate.

I have concerns with the parents' inclusion of the request for an IEE in the due process complaint notice in the first instance (see Parent Ex. A at p. 3). In past decisions SROs, including the undersigned, have permitted a parent to request a district-funded IEE in a due process complaint notice in the first instance (see, e.g. Application of the Dep't of Educ., Appeal No. 21-135); however, I have also expressed reservations that this is not the process contemplated by the IDEA and its implementing regulations (Application of the Dep't of Educ., Appeal No. 23-034; Application of a Student with a Disability, Appeal No. 22-150) and my observation is that the approach has caused more problems than it resolves (34 CFR 300.502[b]; 8 NYCRR 200.5[g][1]). The statute clearly indicates that a district is required to either grant the IEE at public expense or initiate due process to defend its own evaluation of the student, but a district need only do so "without unnecessary delay" (34 CFR 502[b][2]). The process envisions that a district has an opportunity to engage with the parent on the request for an IEE at public expense outside of due process litigation, and if a delay should occur as a result, one of the fact-specific inquiries to be addressed is whether the IEE at public expense should be granted because the district's delay in filing for due process was unnecessary under the circumstances (see Cruz v. Alta Loma Sch. Dist.,

849 F. App'x 678, 679-80 [9th Cir. 2021] [discussing the reasons for the delay and degree to which there was an impasse and finding that the 84-day delay was not an unnecessary delay under the fact specific circumstances]; Alex W. v. Poudre Sch. Dist. R-1, 2022 WL 2763464, at *14 [D. Colo. July 15, 2022] [holding that simply refusing a parent's request for an IEE at public expense is not among the district's permissible options]; MP v. Parkland School District, 2021 WL 3771814, at *18 [E.D. Pa. Aug. 25, 2021] [finding that the school district failed to file a due process complaint altogether and granting IEE at public expense];[18] Pajaro Valley Unified Sch. Dist. v. J.S., 2006 WL 3734289, at *2 [N.D. Cal. Dec. 15, 2006] [finding that an unexplained 82-day delay for commencing due process was unnecessary]; see also Jefferson Cnty. Bd. of Educ. v. Lolita S., 581 F. App'x 760, 765-66 [11th Cir. 2014]; Evans v. Dist. No. 17 of Douglas Cnty., Neb., 841 F.2d 824, 830 [8th Cir. 1988]). As the Second Circuit observed, at no point does a parent need to file a due process complaint notice to obtain an IEE at public expense (Trumbull Bd. of Educ., 975 F.3d at 168-69).[19] My continued study of the judicial and administrative guidance on the topic has led me to change my previous approach of allowing the parent to initially disagree with a district evaluation and request an IEE in a due process complaint notice (without attempting to raise such disagreement with the district first). Moreover, I am convinced in this case that the parents may have included the request for an IEE as an afterthought. This is an improper use of the due process procedures.

Accordingly, I find that the IHO erred in granting the parent's request for an independent neuropsychological evaluation at district expense as the request was raised for the first time in the due process complaint notice. With that said, the parent has a right to request the district to perform a neuropsychological evaluation and any other assessments that she believes would be appropriate. Upon receipt of such request, the district must consider whether it would be appropriate to conduct the evaluations to assess the student's special education needs and, after due consideration, provide the parent with prior written notice describing, if applicable, its reasons for concluding that additional evaluations of the student were unnecessary (8 NYCRR 200.5[a]; see 34 CFR 300.503, 300.305[d]). If the parent is dissatisfied with the district's response or evaluations, the parent may then submit a request to the CSE that it fund an IEE in the manner contemplated by the IDEA, as discussed above.

## VII. Conclusion

The evidence in the hearing record demonstrates that the district failed to offer the student a FAPE for the 2022-23 school year. However, as the IHO did not address the appropriateness of iBrain or equitable considerations and the hearing record is insufficiently developed on the issue of iBrain's delivery of related services during the 2022-23 school year, this matter is remanded to the IHO to make determinations on these issues after further development of the hearing record.

---

[18] The Parkland case also discussed caselaw with different factual circumstances in which the district's failure to file for due process had been excused such as incomplete district evaluations or agreements between the district and parent that the district would conduct further evaluations (2021 WL 3771814, at *18).

[19] The Second Circuit, in Trumbull, speculated that a "hypothetical scenario in which a parent might need to file a due process complaint for a hearing to seek an IEE at public expense is if the school unnecessarily withheld a requested IEE or failed to file its own due process complaint to defend its challenged evaluation as appropriate" (Trumbull, 975 F.3d at 169).

Finally, as the parent's first request for an IEE was raised in her due process appeal, the IHO erred in directing the district to fund an IEE.

**THE APPEAL IS SUSTAINED TO THE EXTENT INDICATED.**

**THE CROSS-APPEAL IS SUSTAINED.**

**IT IS ORDERED** that the IHO's decision dated June 19, 2023 is modified by reversing those portions which found that the district offered the student a FAPE for the 2022-23 school year and ordered an independent neuropsychological at district expense; and

**IT IS FURTHER ORDERED** that the matter is remanded to the IHO for further proceedings regarding the appropriateness of iBrain for the 2022-23 school year and a weighing of equitable considerations in accordance with this decision.

**Dated:**      **Albany, New York**
                **September 20, 2023**

**JUSTYN P. BATES**
**STATE REVIEW OFFICER**

24