# EXHIBIT 5



# The University of the State of New York

## The State Education Department
### State Review Officer
#### www.sro.nysed.gov

No. 23-314

**Application of a STUDENT WITH A DISABILITY, by his parent, for review of a determination of a hearing officer relating to the provision of educational services by the New York City Department of Education**

**Appearances:**

Brain Injury Rights Group, Ltd., attorneys for petitioner, by Zack Zylstra, Esq.

Liz Vladeck, General Counsel, attorneys for respondent, by Sarah M. Pourhosseini, Esq.

## DECISION

### I. Introduction

This proceeding arises under the Individuals with Disabilities Education Act (IDEA) (20 U.S.C. §§ 1400-1482) and Article 89 of the New York State Education Law. Petitioner (the parent) appeals from those portions of a decision of an impartial hearing officer (IHO) which denied her requests for direct funding of the cost of tuition for related services at the International Academy for the Brain (iBrain) and special transportation services for the 2023-24 school year. Respondent (the district) cross-appeals from the IHO's determination that the parent's unilateral placement of her son at iBrain was an appropriate placement and the IHO's order directing the district to fund the student's base tuition costs at iBrain for the 2023-24 school year. The appeal must be sustained. The cross-appeal must be dismissed.

### II. Overview—Administrative Procedures

When a student in New York is eligible for special education services, the IDEA calls for the creation of an individualized education program (IEP), which is delegated to a local Committee on Special Education (CSE) that includes, but is not limited to, parents, teachers, a school psychologist, and a district representative (Educ. Law § 4402; see 20 U.S.C. § 1414[d][1][A]-[B]; 34 CFR 300.320, 300.321; 8 NYCRR 200.3, 200.4[d][2]). If disputes occur between parents and school districts, incorporated among the procedural protections is the opportunity to engage in

mediation, present State complaints, and initiate an impartial due process hearing (20 U.S.C. §§ 1221e-3, 1415[e]-[f]; Educ. Law § 4404[1]; 34 CFR 300.151-300.152, 300.506, 300.511; 8 NYCRR 200.5[h]-[*l*]).

New York State has implemented a two-tiered system of administrative review to address disputed matters between parents and school districts regarding "any matter relating to the identification, evaluation or educational placement of a student with a disability, or a student suspected of having a disability, or the provision of a free appropriate public education to such student" (8 NYCRR 200.5[i][1]; see 20 U.S.C. § 1415[b][6]-[7]; 34 CFR 300.503[a][1]-[2], 300.507[a][1]). First, after an opportunity to engage in a resolution process, the parties appear at an impartial hearing conducted at the local level before an IHO (Educ. Law § 4404[1][a]; 8 NYCRR 200.5[j]). An IHO typically conducts a trial-type hearing regarding the matters in dispute in which the parties have the right to be accompanied and advised by counsel and certain other individuals with special knowledge or training; present evidence and confront, cross-examine, and compel the attendance of witnesses; prohibit the introduction of any evidence at the hearing that has not been disclosed five business days before the hearing; and obtain a verbatim record of the proceeding (20 U.S.C. § 1415[f][2][A], [h][1]-[3]; 34 CFR 300.512[a][1]-[4]; 8 NYCRR 200.5[j][3][v], [vii], [xii]). The IHO must render and transmit a final written decision in the matter to the parties not later than 45 days after the expiration period or adjusted period for the resolution process (34 CFR 300.510[b][2], [c], 300.515[a]; 8 NYCRR 200.5[j][5]). A party may seek a specific extension of time of the 45-day timeline, which the IHO may grant in accordance with State and federal regulations (34 CFR 300.515[c]; 8 NYCRR 200.5[j][5]). The decision of the IHO is binding upon both parties unless appealed (Educ. Law § 4404[1]).

A party aggrieved by the decision of an IHO may subsequently appeal to a State Review Officer (SRO) (Educ. Law § 4404[2]; see 20 U.S.C. § 1415[g][1]; 34 CFR 300.514[b][1]; 8 NYCRR 200.5[k]). The appealing party or parties must identify the findings, conclusions, and orders of the IHO with which they disagree and indicate the relief that they would like the SRO to grant (8 NYCRR 279.4). The opposing party is entitled to respond to an appeal or cross-appeal in an answer (8 NYCRR 279.5). The SRO conducts an impartial review of the IHO's findings, conclusions, and decision and is required to examine the entire hearing record; ensure that the procedures at the hearing were consistent with the requirements of due process; seek additional evidence if necessary; and render an independent decision based upon the hearing record (34 CFR 300.514[b][2]; 8 NYCRR 279.12[a]). The SRO must ensure that a final decision is reached in the review and that a copy of the decision is mailed to each of the parties not later than 30 days after the receipt of a request for a review, except that a party may seek a specific extension of time of the 30-day timeline, which the SRO may grant in accordance with State and federal regulations (34 CFR 300.515[b], [c]; 8 NYCRR 200.5[k][2]).

## III. Facts and Procedural History

The parties' familiarity with this matter is presumed and, therefore, the facts and procedural history of the case will not be recited in detail here. Briefly, the student in this matter has received diagnoses of global developmental delay and a degenerative neuromuscular disorder that affected his "muscle tone, postural responses, and ability to make transitions and movement against gravity" (Parent Exs. B at p. 1; H at ¶3). The student began attending iBrain in September 2022

when he was three years old (Parent Exs. B at p. 1; H at ¶5).[1]  According to the parent, the Committee on Preschool Special Education (CPSE) convened on March 22, 2022 and found the student eligible for special education and related services as a preschool student with a disability for the 2022-23 school year (Parent Ex. A at p. 3).[2]  The hearing record also reflects that the CPSE did not convene to recommend a program and placement for the student for the 2023-24 school year (Parent Exs. A at p. 4; C at p. 1; H at ¶6; see Tr. pp. 29-30).  By letter dated June 20, 2023, the parent "reject[ed] the [district]'s recommended program and placement for [the student] as they have not been informed of an IEP meeting or have had an IEP developed for them" (Parent Ex. C at p. 1).  The parent further notified the district of her intention to unilaterally enroll the student at iBrain for the 2023-24 school year and seek public funding for the total cost of the student's attendance (id. at pp. 1, 2).  In a due process complaint notice, dated July 5, 2023, the parent alleged that the district failed to offer the student a free appropriate public education (FAPE) for the 2023-24 school year (see Parent Ex. A).  Specifically, the parent alleged that the CSE did not convene to develop an IEP for the 2023-24 school year and further failed to recommend a program or placement for the student for the 2023-24 school year (id. at pp. 3-5).

An impartial hearing convened on September 6, 2023 and concluded on September 7, 2023 after two days of proceedings (Tr. pp. 1-129).[3]

In a decision dated November 16, 2023, the IHO determined that the district failed to offer the student a FAPE for the 2023-24 school year (IHO Decision at p. 4).  The IHO further found that the parent had met her burden of establishing that iBrain was an appropriate unilateral placement for the student for the 2023-24 school year (id. at p. 5).  Specifically, the IHO found that the evidence in the hearing record demonstrated that iBrain employed well educated teachers, provided small class sizes and 1:1 instruction utilizing proven methodology, and that the student had made appropriate progress (id.).  The IHO also found that iBrain had identified the student's specific educational needs and that he had made measurable progress (id. at p. 6).  The IHO determined that iBrain had comprehensively tested the student before an individualized, targeted, curriculum was implemented and developed its own education plan that was tailored to the student's strengths (id.).  The IHO also found that the student had made incremental progress in multiple subjects (id.).

Next the IHO found that equitable considerations weighed in favor of the parent (IHO Decision at p. 6).  However, despite finding that the parent acted in good faith, the IHO found that the parent's "request for reimbursement [wa]s only partially justified" (id. at p. 7).  Turning to the

---

[1] The Commissioner of Education has not approved iBrain as a school with which school districts may contract to instruct students with disabilities (see 8 NYCRR 200.1[d]; 200.7).

[2] The student's eligibility for special education as a preschool student with a disability is not in dispute (8 NYCRR 200.1[mm]).

[3] The first IHO assigned to preside over the matter appeared at two pre-hearing conferences and then recused herself (Aug. 2, 3023 Tr. pp. 1-8; Aug. 7, 2023 Tr. pp. 9-13).  The pre-hearing conferences before the prior IHO were paginated consecutively and then the impartial hearing dates before the IHO who completed the hearing were not paginated consecutively with the prior dates before the prior IHO.  As it is not necessary to cite to the conference hearing dates, the transcripts cited in this decision refer to the September 6, 2023 and September 2023 hearing dates and will not be preceded with the date of the impartial hearing.

cost of iBrain, the IHO noted that tuition was broken down into base tuition and supplemental tuition and that transportation was "billed separately" (id.). The IHO found that "[c]learly, for [b]ase [e]ducation and [r]elated [s]ervices to constitute two separate reimbursable categories, additional services must have been provided over and above the [b]ase [e]ducation to justify those additional costs. Otherwise, there is no meaningful distinction between them" and further found that the evidence showed "[r]elated [s]ervices were provided in lieu of [b]ase [e]ducation services, not in addition to them" (id. at p. 8). The IHO then found that "[e]ven if some of the [r]elated [s]ervices took place inside the [g]eneral [e]ducation [c]lassroom, [the s]tudent, a four y[ea]r old child with traumatic brain injury, was not simultaneously receiving [b]ase [e]ducation during administration of various therapies" and as a result "either [the s]tudent was receiving [b]ase [e]ducation, or [r]elated [s]ervices; not both" (id.). The IHO also considered iBrain's extended school day and found that it "was not spent on general education" (id.). The IHO determined that "the provision of [r]elated [s]ervices was at the expense of [b]ase [e]ducation not in addition to it" and that "the proper way to account for providing [r]elated [s]ervices would have been to reduce the amount of [b]ase [e]ducational [s]ervices by the amount of the [r]elated [s]ervices since no additional services were provided" (id.). For those reasons, the IHO determined that the parent's "request for reimbursement for $100,848.00 in [r]elated [s]ervices [wa]s improper" and the IHO denied funding for it (id.).

The IHO then considered the parent's request for "reimbursement" for the cost of transportation in the amount of $128,620 (IHO Decision at p. 9). The IHO noted that the district had argued that the amount requested was "excessive, unwarranted, and unsupported by the evidence"; however, the district had conceded that the parent should be "reimbursed for the cost of a wheelchair lift transportation and a 1:1 para[professional]" (id.). The IHO also stated that the district had not provided any evidence of appropriate transportation cost or demonstrated the excessiveness of the parent's request (id.). The IHO determined that the parent was "entitled to reimbursement for the cost of transportation" and that it would be "inequitable" for the parent to contract with a company that charged excessive rates (id.). The IHO found that the parent was entitled to reimbursement for special transportation that included a paraprofessional, a wheelchair lift, air-conditioning, and limited travel time at a market rate (id.).

The IHO ordered the district to "fund the cost" of the student's 2023-24 school year tuition "and pay to" iBrain a total amount of $190,000 (IHO Decision at p. 10). The IHO further ordered the district "to fund the cost" of the student's transportation "for a sixty-minute trip each way, in a climate-controlled vehicle with a wheelchair lift, and a paraprofessional at the market rate of such transportation" (id.).

## IV. Appeal for State-Level Review

The parent appeals and argues that the IHO erred in failing to award direct funding of the student's base tuition and supplemental tuition at the amounts set forth in the enrollment contract. The parent further argues that the IHO's findings were not logical and there was no support in the hearing record for reducing the amount of the parent's requested award. The parent also alleges that the IHO erred in failing to award direct payment of the student's special transportation in accordance with the terms of the contract.

In an answer and cross-appeal, the district asserts that the IHO erred in finding iBrain was an appropriate unilateral placement, that the parent failed to demonstrate that iBrain offered specialized instruction designed to meet the student's needs, and that there was no evidence in the hearing record related to the educational program the student received during the 2023-24 school year. The district further argues that the IHO should have denied all of the parent's requested relief, and in the alternative, that the IHO correctly reduced the amount of tuition awarded and the amount of special transportation awarded. In addition, the district argues that the parent failed to establish an entitlement to direct payment and that the IHO correctly awarded reimbursement.

In a reply and answer to the cross-appeal, the parent reasserts the claims in her request for review and argues that the IHO correctly found iBrain was an appropriate unilateral placement for the student for the 2023-24 school year.

## V. Applicable Standards

Two purposes of the IDEA (20 U.S.C. §§ 1400-1482) are (1) to ensure that students with disabilities have available to them a FAPE that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living; and (2) to ensure that the rights of students with disabilities and parents of such students are protected (20 U.S.C. § 1400[d][1][A]-[B]; see generally Forest Grove Sch. Dist. v. T.A., 557 U.S. 230, 239 [2009]; Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 206-07 [1982]).

A FAPE is offered to a student when (a) the board of education complies with the procedural requirements set forth in the IDEA, and (b) the IEP developed by its CSE through the IDEA's procedures is reasonably calculated to enable the student to receive educational benefits (Rowley, 458 U.S. at 206-07; T.M. v. Cornwall Cent. Sch. Dist., 752 F.3d 145, 151, 160 [2d Cir. 2014]; R.E. v. New York City Dep't of Educ., 694 F.3d 167, 189-90 [2d Cir. 2012]; M.H. v. New York City Dep't of Educ., 685 F.3d 217, 245 [2d Cir. 2012]; Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 [2d Cir. 2005]). "'[A]dequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP'" (Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 129 [2d Cir. 1998], quoting Rowley, 458 U.S. at 206; see T.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 253 [2d Cir. 2009]). The Supreme Court has indicated that "[t]he IEP must aim to enable the child to make progress. After all, the essential function of an IEP is to set out a plan for pursuing academic and functional advancement" (Endrew F. v. Douglas Cty. Sch. Dist. RE-1, 580 U.S. 386, 399 [2017]). While the Second Circuit has emphasized that school districts must comply with the checklist of procedures for developing a student's IEP and indicated that "[m]ultiple procedural violations may cumulatively result in the denial of a FAPE even if the violations considered individually do not" (R.E., 694 F.3d at 190-91), the Court has also explained that not all procedural errors render an IEP legally inadequate under the IDEA (M.H., 685 F.3d at 245; A.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist., 553 F.3d 165, 172 [2d Cir. 2009]; Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 381 [2d Cir. 2003]). Under the IDEA, if procedural violations are alleged, an administrative officer may find that a student did not receive a FAPE only if the procedural inadequacies (a) impeded the student's right to a FAPE, (b) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to the student, or (c) caused a deprivation of educational benefits (20 U.S.C. § 1415[f][3][E][ii]; 34 CFR

5

300.513[a][2]; 8 NYCRR 200.5[j][4][ii]; <u>Winkelman v. Parma City Sch. Dist.</u>, 550 U.S. 516, 525-26 [2007]; <u>R.E.</u>, 694 F.3d at 190; <u>M.H.</u>, 685 F.3d at 245).

The IDEA directs that, in general, an IHO's decision must be made on substantive grounds based on a determination of whether the student received a FAPE (20 U.S.C. § 1415[f][3][E][i]). A school district offers a FAPE "by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction" (<u>Rowley</u>, 458 U.S. at 203). However, the "IDEA does not itself articulate any specific level of educational benefits that must be provided through an IEP" (<u>Walczak</u>, 142 F.3d at 130; <u>see Rowley</u>, 458 U.S. at 189). "The adequacy of a given IEP turns on the unique circumstances of the child for whom it was created" (<u>Endrew F.</u>, 580 U.S. at 404). The statute ensures an "appropriate" education, "not one that provides everything that might be thought desirable by loving parents" (<u>Walczak</u>, 142 F.3d at 132, quoting <u>Tucker v. Bay Shore Union Free Sch. Dist.</u>, 873 F.2d 563, 567 [2d Cir. 1989] [citations omitted]; <u>see Grim</u>, 346 F.3d at 379). Additionally, school districts are not required to "maximize" the potential of students with disabilities (<u>Rowley</u>, 458 U.S. at 189, 199; <u>Grim</u>, 346 F.3d at 379; <u>Walczak</u>, 142 F.3d at 132). Nonetheless, a school district must provide "an IEP that is 'likely to produce progress, not regression,' and . . . affords the student with an opportunity greater than mere 'trivial advancement'" (<u>Cerra</u>, 427 F.3d at 195, quoting <u>Walczak</u>, 142 F.3d at 130 [citations omitted]; <u>see T.P.</u>, 554 F.3d at 254; <u>P. v. Newington Bd. of Educ.</u>, 546 F.3d 111, 118-19 [2d Cir. 2008]). The IEP must be "reasonably calculated to provide some 'meaningful' benefit" (<u>Mrs. B. v. Milford Bd. of Educ.</u>, 103 F.3d 1114, 1120 [2d Cir. 1997]; <u>see Endrew F.</u>, 580 U.S. at 403 [holding that the IDEA "requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances"]; <u>Rowley</u>, 458 U.S. at 192). The student's recommended program must also be provided in the least restrictive environment (LRE) (20 U.S.C. § 1412[a][5][A]; 34 CFR 300.114[a][2][i], 300.116[a][2]; 8 NYCRR 200.1[cc], 200.6[a][1]; <u>see Newington</u>, 546 F.3d at 114; <u>Gagliardo v. Arlington Cent. Sch. Dist.</u>, 489 F.3d 105, 108 [2d Cir. 2007]; <u>Walczak</u>, 142 F.3d at 132).

An appropriate educational program begins with an IEP that includes a statement of the student's present levels of academic achievement and functional performance (<u>see</u> 34 CFR 300.320[a][1]; 8 NYCRR 200.4[d][2][i]), establishes annual goals designed to meet the student's needs resulting from the student's disability and enable him or her to make progress in the general education curriculum (<u>see</u> 34 CFR 300.320[a][2][i], [2][i][A]; 8 NYCRR 200.4[d][2][iii]), and provides for the use of appropriate special education services (<u>see</u> 34 CFR 300.320[a][4]; 8 NYCRR 200.4[d][2][v]).[4]

A board of education may be required to reimburse parents for their expenditures for private educational services obtained for a student by his or her parents, if the services offered by the board of education were inadequate or inappropriate, the services selected by the parents were appropriate, and equitable considerations support the parents' claim (<u>Florence County Sch. Dist. Four v. Carter</u>, 510 U.S. 7 [1993]; <u>Sch. Comm. of Burlington v. Dep't of Educ.</u>, 471 U.S. 359, 369-

---

[4] The Supreme Court has stated that even if it is unreasonable to expect a student to attend a regular education setting and achieve on grade level, the educational program set forth in the student's IEP "must be appropriately ambitious in light of his [or her] circumstances, just as advancement from grade to grade is appropriately ambitious for most children in the regular classroom. The goals may differ, but every child should have the chance to meet challenging objectives" (<u>Endrew F.</u>, 580 U.S. at 402).

70 [1985]; R.E., 694 F.3d at 184-85; T.P., 554 F.3d at 252).  In Burlington, the Court found that Congress intended retroactive reimbursement to parents by school officials as an available remedy in a proper case under the IDEA (471 U.S. at 370-71; see Gagliardo, 489 F.3d at 111; Cerra, 427 F.3d at 192).  "Reimbursement merely requires [a district] to belatedly pay expenses that it should have paid all along and would have borne in the first instance" had it offered the student a FAPE (Burlington, 471 U.S. at 370-71; see 20 U.S.C. § 1412[a][10][C][ii]; 34 CFR 300.148).

The burden of proof is on the school district during an impartial hearing, except that a parent seeking tuition reimbursement for a unilateral placement has the burden of proof regarding the appropriateness of such placement (Educ. Law § 4404[1][c]; see R.E., 694 F.3d at 184-85).

## VI. Discussion

Neither party appeals from the IHO's determination that the district failed to offer the student a FAPE for the 2023-24 school year (IHO Decision at p. 4).  As such, this finding has become final and binding on the parties and will not be reviewed on appeal (34 CFR 300.514[a]; 8 NYCRR 200.5[j][5][v]; see M.Z. v. New York City Dep't of Educ., 2013 WL 1314992, at *6-*7, *10 [S.D.N.Y. Mar. 21, 2013]).  Therefore, the only issues left to be resolved are whether the IHO erred in finding that the parent's unilateral placement of the student at iBrain for the 2023-24 school year was appropriate and whether the IHO erred in the relief ordered.

### A. Unilateral Placement

The district appeals from the IHO's finding that the parent sustained her burden to show that iBrain was an appropriate unilateral placement for the student during the 2023-24 school year. Specifically, the district alleges that the record was "devoid of any evidence" that the program provided to the student was individualized to meet the student's unique needs or that the student made progress at iBrain (Answer and Cross-Appeal ¶18).  The district further argues that the evidence offered by the parent was related to the 2022-23 school year and that the testimony of iBrain's director of special education was unsupported by any documentary evidence.

A private school placement must be "proper under the Act" (Carter, 510 U.S. at 12, 15; Burlington, 471 U.S. at 370), i.e., the private school offered an educational program which met the student's special education needs (see Gagliardo, 489 F.3d at 112, 115; Walczak, 142 F.3d at 129). A parent's failure to select a program approved by the State in favor of an unapproved option is not itself a bar to reimbursement (Carter, 510 U.S. at 14).  The private school need not employ certified special education teachers or have its own IEP for the student (Carter, 510 U.S. at 13-14). Parents seeking reimbursement "bear the burden of demonstrating that their private placement was appropriate, even if the IEP was inappropriate" (Gagliardo, 489 F.3d at 112; see M.S. v. Bd. of Educ. of the City Sch. Dist. of Yonkers, 231 F.3d 96, 104 [2d Cir. 2000]).  "Subject to certain limited exceptions, 'the same considerations and criteria that apply in determining whether the [s]chool [d]istrict's placement is appropriate should be considered in determining the appropriateness of the parents' placement'" (Gagliardo, 489 F.3d at 112, quoting Frank G. v. Bd. of Educ. of Hyde Park, 459 F.3d 356, 364 [2d Cir. 2006]; see Rowley, 458 U.S. at 207).  Parents need not show that the placement provides every special service necessary to maximize the student's potential (Frank G., 459 F.3d at 364-65).  When determining whether a unilateral placement is appropriate, "[u]ltimately, the issue turns on" whether the placement is "reasonably

7

calculated to enable the child to receive educational benefits" (Frank G., 459 F.3d at 364; see Gagliardo, 489 F.3d at 115; Berger v. Medina City Sch. Dist., 348 F.3d 513, 522 [6th Cir. 2003] ["evidence of academic progress at a private school does not itself establish that the private placement offers adequate and appropriate education under the IDEA"]). A private placement is appropriate if it provides instruction specially designed to meet the unique needs of a student (20 U.S.C. § 1401[29]; Educ. Law § 4401[1]; 34 CFR 300.39[a][1]; 8 NYCRR 200.1[ww]; Hardison v. Bd. of Educ. of the Oneonta City Sch. Dist., 773 F.3d 372, 386 [2d Cir. 2014]; C.L. v. Scarsdale Union Free Sch. Dist., 744 F.3d 826, 836 [2d Cir. 2014]; Gagliardo, 489 F.3d at 114-15; Frank G., 459 F.3d at 365).

The Second Circuit has set forth the standard for determining whether parents have carried their burden of demonstrating the appropriateness of their unilateral placement.

> No one factor is necessarily dispositive in determining whether parents' unilateral placement is reasonably calculated to enable the child to receive educational benefits. Grades, test scores, and regular advancement may constitute evidence that a child is receiving educational benefit, but courts assessing the propriety of a unilateral placement consider the totality of the circumstances in determining whether that placement reasonably serves a child's individual needs. To qualify for reimbursement under the IDEA, parents need not show that a private placement furnishes every special service necessary to maximize their child's potential. They need only demonstrate that the placement provides educational instruction specially designed to meet the unique needs of a handicapped child, supported by such services as are necessary to permit the child to benefit from instruction.

(Gagliardo, 489 F.3d at 112, quoting Frank G., 459 F.3d at 364-65).

Although not in dispute on appeal, discussion of the student's needs is necessary to determine whether iBrain provided specially designed instruction to meet those needs. Consistent with the director's testimony, the August 2023 iBrain education plan described the student as nonverbal and non-ambulatory with deficits in coordination, motor abilities, and intellectual functioning (Parent Exs. B at p. 1; I at ¶9).[5]

The iBrain education plan indicated that the student benefited from verbal and physical prompts to maintain attention and alertness and he followed one to two step directions (Parent Ex. B at pp. 1, 2). The student interacted with the environment using vision, tactile exploration, and receptive and expressive auditory inputs, including language (id. at p. 1). He held objects very close to examine and manipulate them and he responded to guidance for tactual exploration of materials (id.). According to the iBrain education plan, the student used a variety of

---

[5] The hearing record shows that iBrain developed an initial education plan for the student dated September 23, 2022 (Parent Ex. B at p. 1; I at ¶11). The same iBrain education plan referenced report updates of February 28, 2023, and August 18, 2023 (Parent Ex. B at p. 1). Additionally, according to the iBrain education plan, the special education service recommendations were projected to begin on July 6, 2023 (id. at pp. 39-41).

communication methods including vocalizations, eye movements, picture symbols, sign language (more, go, want, music, stop), and reaching for desired items (id. at pp. 1-2). He demonstrated the ability to activate voice-output switches to communicate and make choices (id. at p. 2). He often engaged in activities and benefited from sensory input (songs) to help him focus on the task at hand, especially for less desired activities (id.). The student demonstrated strong auditory skills and reacted to sounds and people in his environment by smiling, laughing, and turning his head (id.). He demonstrated understanding of cause and effect, as evidenced by activating a switch connected to a voice output communication aid to respond or make comments (id.). The student engaged within academic sessions by commenting, answering questions by accurately selecting choices from picture symbols, and by activating a switch with moderate verbal and physical prompts (id.).

The iBrain education plan indicated that with regard to physical and motor development, the student presented with low muscle tone in the upper extremities and trunk and spasticity in the lower extremities (Parent Ex. B at p. 18). He presented with poor body awareness and poor static and dynamic balance, which made it difficult to perform functional activities and safely navigate his environment without external support and physical assistance (id.). The student was transported in a wheelchair in all settings, and he demonstrated the ability to creep forward on the mat with minimal assistance (id.). At school, he was most frequently seated in an activity chair with a tray adapted for his needs (id. at p. 1). For most activities, the tray provided postural support as well as a surface where the student could actively visually and physically engage with instructional materials (id.). The iBrain education plan indicated that the student responded to opportunities for movement and to move in and out of his activity chair throughout the day, exploring his environment through the use of a classroom mat to move around with assistance for safety (id.). He demonstrated purposeful movements in his bilateral upper extremities in order to reach for preferred toys; however, he demonstrated ataxic movement patterns that lacked coordination and motor control (id. at p. 18). Regarding fine motor skills, the student was able to assume a functional grasp on a writing utensil and required moderate hand-over-hand assistance to maintain a palmar supinate grasp to imitate lines (id.). He was able to initiate movement downwards and across the paper with consistent verbal prompting to engage in pre-writing tasks (id.). With regard to play/leisure, the student was able to maintain a gross palmer grasp on large toys including blocks and balls for greater than 20 seconds without dropping (id.).

Regarding self-care skills, the iBrain education plan indicated the student required set-up assistance to assume a functional grasp on a hairbrush (Parent Ex. B at p. 9). He had made fast, steady progress with self-feeding skills using a utensil, and the student demonstrated some finger feeding skills and drank from a two-handle cup (id. at pp. 9, 16). The student worked on upper body dressing by extending his arms to push through his sleeves (id. at p. 9). He required moderate physical assistance and increased time to initiate extending his arms to thread the sleeves of a jacket (id.).

The iBrain education plan indicated the student benefited from engaging in sensory regulation strategies at the start of treatment sessions to improve engagement, regulation, and overall participation (Parent Ex. B at p. 9). He also benefited from a quiet environment, a play-based treatment approach, and a structured routine (id.). Occasionally, the student experienced difficulty with emotional regulation due to lethargy on days he did not sleep well the night before and he often napped during the day (id. at pp. 2, 8). He benefited from calming auditory stimuli

(preferred music), a quiet environment and linear/rocking vestibular input to assist with improved emotional regulation (id. at p. 8). Following sensory input, the student was able to regulate and engage in preferred and therapist-led activities (id.).

Turning to the student's program, in her written testimony, the director of special education at iBrain (director) described iBrain as a private, highly specialized school for students who "suffer from acquired brain injuries or brain-based disorders" (Parent Ex. I at ¶¶ 1, 5). She further explained that iBrain has an extended 12-month school year calendar and offers an extended school day (8:30 am – 5:00 pm), and that every student who attends iBrain requires a 1:1 paraprofessional to assist with activities of daily living (ADLs) to access and benefit from the educational program (id. at ¶¶5, 14).

Beginning July 6, 2023, the student's iBrain education plan recommended a 12-month program in a 6:1+1 special class with an extended school day (Parent Ex. B at p. 40). Related services recommended were five 60-minute sessions per week each of occupational therapy (OT), physical therapy (PT), and speech-language therapy, and two 60-minute individual and one 60-minute group sessions per week of music therapy (id.).[6] The iBrain education plan also provided for the student to receive individual 1:1 paraprofessional services throughout the day, and one 60-minute session per week of individual and indirect assistive technology services (id.). The student was recommended to receive assistive technology devices on an individual and continuous basis, including an augmentative and alternative communication (AAC) device, an AAC wheelchair mount, switches, switch mounts, computer, computer switch interface, software, and adaptive seating (id. at pp. 13, 40-41). The same education plan listed supports for school staff on behalf of the student which included training for AAC techniques and use, training for health and safety precautions, training for 1:1 direct instruction model, and training for use of equipment (id. at p. 41).[7]

Additionally, iBrain identified management strategies including verbal, tactile, and visual cueing, prompting and modeling; movement or sensory breaks during seated academic tasks; a quiet, isolated environment to decrease distractions and overstimulation; positional aids and equipment; orthotics; and assistive technology devices and equipment (Parent Ex. B at pp. 9-10). To address the student's identified needs, the iBrain education plan included numerous annual

---

[6] Review of the hearing record revealed some discrepancies with regard to how much vision education services and music therapy the student received. Although the director testified that the student received vision education services (Parent Ex. I at ¶13), review of the iBrain education plan revealed the section of the plan reserved for documenting the student's present performance, strengths, and needs specific to vision education services was left blank, and the plan did not include a recommendation for the student to receive vision education services (Parent Ex. B at pp. 11-12, 39-41). With regard to music therapy, the iBrain education plan indicated that as of July 6, 2023 the student would receive two individual 60-minute sessions per week and one 60-minute group session per week (id. at p. 40). In another location of the iBrain education plan, the student was recommended to receive three individual 60-minute sessions of music therapy and one 60-minute group music therapy session in the classroom, and there was to be no change in the frequency/duration from what the student was then-currently receiving (id. at p. 31). However, these discrepancies are not sufficient to overturn the IHO's determination that the student's overall program at iBrain was appropriate.

[7] To further support the student, the iBrain education plan recommended "various" 60-minute sessions per month of parent counseling and training, depending on need (Parent Ex. B at p. 40).

10

goals and corresponding objectives or benchmarks that targeted the student's needs as identified by iBrain (id. at pp. 27-37). Specifically, the iBrain IEP included annual goals to improve the student's ability to regulate behavior using communication, build pre-literacy skills, demonstrate understanding of foundational math concepts, improve fine and gross motor functioning, follow one step directions, use total communication to greet, improve functional mobility, improve participation in academic, play, and self-care activities, and trial a variety of AAC devices (id. at pp. 27-37).

The director testified that, during the 2023-24 school year, the student attended a 6:1+1 class in-person at one of iBrain's locations, and that he had always attended the school in-person (Tr. pp. 46-47).[8] According to the director, the 6:1+1 classrooms at iBrain contained one teacher and one teacher assistant, and each student had his or her own 1:1 paraprofessional; in some instances, a few students also had a 1:1 nurse (Tr. p. 52). The student's 6:1+1 class was the youngest class comprised of students between the ages of four and seven years old, and all of the students in the class were within approximately 12 to 18 months of each other, developmentally (Tr. pp. 47, 59-60). In the student's 6:1+1 class everyone used assistive technology devices and all students received direct 1:1 instruction (Tr. p. 48).

In light of the above, review of the hearing record shows that it contains sufficient evidence to conclude that iBrain staff identified the student's special education needs, and developed a program for the student for the 2023-24 school year that was individualized and offered instruction specially designed to meet his unique needs.

Turning to the district's argument that the parent failed to present evidence of the student's progress during the school year at issue, it is noted that the final date of the impartial hearing occurred on September 7, 2023, less than three months into the 12-month 2023-24 school year. Accordingly, it is not clear that a great deal of evidence was available to the parent at the time of the hearing specific to the 2023-24 school year. In any event, it is well settled that a finding of progress is not required for a determination that a student's unilateral placement is adequate (Scarsdale Union Free Sch. Dist. v. R.C., 2013 WL 563377, at *9-*10 [S.D.N.Y. Feb. 4, 2013] [noting that evidence of academic progress is not dispositive in determining whether a unilateral placement is appropriate]; see M.B. v. Minisink Valley Cent. Sch. Dist., 523 Fed. App'x 76, 78 [2d Cir. Mar. 29, 2013]; D.D-S. v. Southold Union Free Sch. Dist., 506 Fed. App'x 80, 81 [2d Cir. Dec. 26, 2012]; L.K. v. Ne. Sch. Dist., 932 F. Supp. 2d 467, 486-87 [S.D.N.Y. 2013]; C.L. v. Scarsdale Union Free Sch. Dist., 913 F. Supp. 2d 26, 34, 39 [S.D.N.Y. 2012]; G.R. v. New York City Dep't of Educ., 2009 WL 2432369, at *3 [S.D.N.Y. Aug. 7, 2009]; Omidian v. Bd. of Educ. of New Hartford Cent. Sch. Dist., 2009 WL 904077, at *22-*23 [N.D.N.Y. Mar. 31, 2009]; see also Frank G., 459 F.3d at 364). However, while not dispositive, a finding of progress is, nevertheless, a relevant factor to be considered in determining whether a unilateral placement is

---

[8] The 12-month 2023-24 school year began on July 1, 2023 and the hearing in this matter concluded on September 7, 2023 (Tr. p. 142). The district argues that the director lacked sufficient basis of knowledge about the student's program and cited to testimony that she had not observed the student "as often as [she] would like" (Tr. pp. 72;73). However, review of her written testimony and testimony during the hearing shows that she had knowledge of the student's needs and iBrain program, which was generally consistent with the iBrain education plan (Tr. pp. 44-104, 107; Parent Exs. B; I).

appropriate (<u>Gagliardo</u>, 489 F.3d at 115, citing <u>Berger</u>, 348 F.3d at 522 and <u>Rafferty v. Cranston Public Sch. Comm.</u>, 315 F.3d 21, 26-27 [1st Cir. 2002]).

While there is not a great deal of evidence of the student's progress during the 2023-24 school year, and it is unclear which information provided in the iBrain education plan was from the most recent update, the evidence does demonstrate that the student made progress during the 2022-23 school year and was expected to continue to do so.  Review of the iBrain education plan shows that although the report was originally drafted in September 2022, it included updated information from February 28, 2023, and August 18, 2023, and indicated that the student had made progress (<u>see</u> Parent Ex. B at pp. 1, 4, 8, 9, 13).

With regard to progress in the student's targeted areas, the iBrain education plan indicated that the student was making "fast, steady progress" toward communication skills in speech-language therapy, in fine motor skills when engaging in play, and with self-feeding skills; "consistent progress" toward play/leisure related and self-care goals; and "slow and steady progress" in all academic related goals (Parent Ex. B at pp. 4, 8, 9).  Additionally, the iBrain plan indicated that the student made "incremental progress" in ongoing trials of various assistive technology access points and modalities (<u>id.</u> at p. 13).

Review of the July 2023 quarterly progress report revealed that the student's skills in areas such as improving letter awareness, exploring tactile elements of a book, staying attentive and interactive during classroom activities, responding to questions about feelings and expressing a range of emotions, following a one-step direction, making choices, improving functional endurance and a variety of fine motor skills, increasing socialization with peers, and improving transition skills for functional mobility were considered to be "[e]merging" (Parent Ex. G at pp. 1, 2, 4, 7, 10, 11, 13).  The student had exhibited emerging skills toward or achieved his annual goal to increase expressive language skills using multimodal means of communication and increase auditory comprehension skills for core language (<u>id.</u> at pp. 17, 18).

The iBrain director testified that "over the past school year," the student made progress in skills across all academic and related service domains in his educational program at iBRAIN (Parent Ex. I at ¶15).  Specifically, the director testified that the student made progress in his ability to maintain attention and participate in class, follow directions, show familiarity with books and print concepts, identify body parts, and develop "early skills" needed to move toward age-appropriate goals (Tr. pp. 93-94).  She indicated that she anticipated him to continue to build upon the progress he has made, as long as he was provided with continuity in regard to his educational program (Parent Ex. I at ¶15).

The district has not rebutted the evidence in the hearing record which shows that the student made progress in iBrain's program during the 2022-23 school year.  As such, although the timing of the impartial hearing in this matter somewhat impeded the development of the hearing record with respect to the student's progress during the 2023-24 school year, the lack of specific examples of progress for that school year is not dispositive in determining whether iBrain offered an appropriate program.

Accordingly, there is an insufficient evidentiary basis to disturb the IHO's determination that the parent met her burden of demonstrating that iBrain was an appropriate unilateral placement for the 2023-24 school year.

**B. Equitable Considerations**

Turning to the IHO's analysis of equitable considerations, I find that the IHO erred in both his reduction of the tuition award and in the reduction of the transportation award.

The final criterion for a reimbursement award is that the parents' claim must be supported by equitable considerations. Equitable considerations are relevant to fashioning relief under the IDEA (Burlington, 471 U.S. at 374; R.E., 694 F.3d at 185, 194; M.C. v. Voluntown Bd. of Educ., 226 F.3d 60, 68 [2d Cir. 2000]; see Carter, 510 U.S. at 16 ["Courts fashioning discretionary equitable relief under IDEA must consider all relevant factors, including the appropriate and reasonable level of reimbursement that should be required. Total reimbursement will not be appropriate if the court determines that the cost of the private education was unreasonable"]; L.K. v. New York City Dep't of Educ., 674 Fed. App'x 100, 101 [2d Cir. Jan. 19, 2017]). With respect to equitable considerations, the IDEA also provides that reimbursement may be reduced or denied when parents fail to raise the appropriateness of an IEP in a timely manner, fail to make their child available for evaluation by the district, or upon a finding of unreasonableness with respect to the actions taken by the parents (20 U.S.C. § 1412[a][10][C][iii]; 34 CFR 300.148[d]; E.M. v. New York City Dep't of Educ., 758 F.3d 442, 461 [2d Cir. 2014] [identifying factors relevant to equitable considerations, including whether the withdrawal of the student from public school was justified, whether the parent provided adequate notice, whether the amount of the private school tuition was reasonable, possible scholarships or other financial aid from the private school, and any fraud or collusion on the part of the parent or private school]; C.L., 744 F.3d at 840 [noting that "[i]mportant to the equitable consideration is whether the parents obstructed or were uncooperative in the school district's efforts to meet its obligations under the IDEA"]).

Reimbursement may be reduced or denied if parents do not provide notice of the unilateral placement either at the most recent CSE meeting prior to their removal of the student from public school, or by written notice ten business days before such removal, "that they were rejecting the placement proposed by the public agency to provide a [FAPE] to their child, including stating their concerns and their intent to enroll their child in a private school at public expense" (20 U.S.C. § 1412[a][10][C][iii][I]; see 34 CFR 300.148[d][1]). This statutory provision "serves the important purpose of giving the school system an opportunity, before the child is removed, to assemble a team, evaluate the child, devise an appropriate plan, and determine whether a [FAPE] can be provided in the public schools" (Greenland Sch. Dist. v. Amy N., 358 F.3d 150, 160 [1st Cir. 2004]). Although a reduction in reimbursement is discretionary, courts have upheld the denial of reimbursement in cases where it was shown that parents failed to comply with this statutory provision (Greenland, 358 F.3d at 160; Ms. M. v. Portland Sch. Comm., 360 F.3d 267 [1st Cir. 2004]; Berger v. Medina City Sch. Dist., 348 F.3d 513, 523-24 [6th Cir. 2003]; Rafferty v. Cranston Public Sch. Comm., 315 F.3d 21, 27 [1st Cir. 2002]); see Frank G., 459 F.3d at 376; Voluntown, 226 F.3d at 68).

There is no allegation that the parent failed to provide timely notice of her intention to unilaterally place the student for the 2023-24 school year or that the parent failed to cooperate in

developing an educational program for the student as the hearing record does not indicate that the district made any attempt at developing an IEP for the student for the school year in question (see Parent Ex. C). Accordingly, the only equitable ground at issue relates to the costs of tuition and privately obtained transportation services.

Notably, the district did not allege during the impartial hearing that the student could not simultaneously receive instruction in accordance with the structure set forth in the iBrain enrollment contract for base tuition and supplemental tuition (Parent Ex. D at pp. 1-2). As described above, the IHO found that the delineation of base tuition and supplemental tuition on the iBrain enrollment contract served to create "two separate reimbursable categories" and that "additional services must have been provided over and above the [b]ase [e]ducation to justify those additional costs" (IHO Decision at p. 8). The IHO found that the evidence showed that "[r]elated [s]ervices were provided in lieu of [b]ase [e]ducation services, not in addition to them" (id.). This finding was not supported by the hearing record, was not raised by the district to rebut the parent's evidence during the impartial hearing, and, accordingly, the IHO erred in reducing the parent's award of direct funding for tuition on this ground.[9]

With regard to the IHO's reduction in the award of transportation funding from the amount set forth in the contract to a market rate, there is no dispute that the district failed to convene a CPSE meeting for the student for the 2023-24 school year. As a result, the student was not offered any program or related services, which, in turn included no offer of special transportation. The district did not come forward with any evidence to rebut the parent's provision of special transportation such as an offer of comparable services or evidence of a reasonable market rate. Accordingly, it appears that the lack of a recommendation for special transportation caused the parent to exercise self-help and remedy the district's failure by implementing transportation privately.

In addition, although, the district asserts that the IHO awarded reimbursement for transportation services that were actually provided, I am not convinced that the district's interpretation of the IHO's decision is correct. To be sure, the IHO's language in the body of his decision was imprecise in his interchangeable use of "reimburse" and "fund"; however, it does not appear that the order should be read as providing funding only for days the student was actually provided with transportation services as the IHO order provided that the district was "to fund the cost" of the student's transportation "for a sixty-minute trip each way, in a climate controlled vehicle with a wheelchair lift, and a paraprofessional at the market rate of such transportation" (IHO Decision at pp. 9, 10). In any event, the parent has appealed the IHO's failure to order direct funding of the full amount of the transportation contract and appealed any limitation on the award.

Among the factors that may warrant a reduction in tuition based on equitable considerations is whether the frequency of the services or the cost for the services was excessive (M.C., 226 F.3d at 68; see Carter, 510 U.S. at 16 ["Courts fashioning discretionary equitable relief under IDEA must consider all relevant factors, including the appropriate and reasonable level of reimbursement that should be required. Total reimbursement will not be appropriate if the court determines that

---

[9] It is incumbent upon an IHO to disclose his or her intention to reach an issue which the parties have not raised as a matter of basic fairness and due process of law (Application of a Child with a Handicapping Condition, Appeal No. 91-40; see John M. v. Bd. of Educ. of Evanston Tp. High Sch. Dist. 202, 502 F.3d 708, 713 [7th Cir. 2007]).

the cost of the private education was unreasonable"]; L.K., 674 Fed. App'x at 101; E.M., 758 F.3d at 461 [noting that whether the amount of the private school tuition was reasonable is one factor relevant to equitable considerations]).  The IHO may consider evidence regarding whether the rate charged by the private school or agency was unreasonable or regarding any segregable costs charged by the private school or agency that exceed the level that the student required to receive a FAPE (see L.K. v. New York City Dep't of Educ., 2016 WL 899321, at *7 [S.D.N.Y. Mar. 1, 2016], aff'd in part, 674 Fed. App'x 100).

The IHO indicated in his decision that the district had argued that the amount requested for transportation costs was "excessive, unwarranted, and unsupported by the evidence"; however, he found that the district had conceded that the parent should be "reimbursed for the cost of a wheelchair lift transportation and a 1:1 para[professional]" (IHO Decision at p. 9).  The IHO also stated that the district had not provided any evidence of appropriate transportation costs or demonstrated the excessiveness of the parent's request (id.).  The IHO determined that the parent was "entitled to reimbursement for the cost of transportation" and, without specifically finding that the rates charged by the transportation company the parent contracted with, the IHO indicated it would be "inequitable" for the parent to contract with a company that charged excessive rates (id.).  The IHO's determination on this issue presupposes, without evidence, that the parent acted unreasonably in entering into the contract.

In addition, to the extent the IHO's decision can be read to order funding based on actual use,  during the impartial hearing, the district did not offer any evidence that other transportation options were available to meet the student's needs, which would have resulted in a more reasonable cost, nor did it identify any other company with whom the parent could have contracted that would not have charged for the days when the student did not utilize the services.[10]  Accordingly, the evidence in the hearing record would not support an order requiring the district to fund only transportation services actually delivered notwithstanding the parent's financial obligation to fund the entire amount due under the contract.

The IHO's order of a market rate was also unsupported by the hearing record.  In the absence of any documentary or testimonial evidence regarding the reasonableness of the costs of the transportation services, an IHO is not permitted to rely on his own knowledge of the market for special transportation services (i.e., judicial notice).[11]  Nevertheless, in this instance, the IHO

---

[10] As the parent notes, in a recent case involving enforcement of pendency orders requiring the district to fund private transportations costs, a district court reviewed similar contracts with the same transportation company and noted that the terms of the contracts required parents "to pay fees irrespective of whether the students use[d] the services" (Abrams v. New York City Dep't. of Educ., 2022 WL 523455 at *5 [S.D.N.Y. Feb. 22, 2022]).  However, another district court has recently noted that in assessing the reasonableness of the costs attendant to a transportation contract, an IHO may consider that "there are many services one might be required to pay for regardless of whether or how much they are used," but that contracted for costs are not "automatically reasonable because they are specified by the [c]ontract" (Araujo v. New York City Dep't. of Educ., 2023 WL 5097982 at *5).

[11] Generally, an adjudicative fact may be judicially noticed when that fact "is not subject to reasonable dispute because it" is either "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned" (Fed. R. Evid. 201[a], [b][1]-[b][2]).  While a court is empowered with the discretion to "take judicial notice on its own," a court "must take judicial notice if a party requests it and the court is supplied with the necessary information" (Fed. R. Evid.

did not even make a finding that the transportation costs as set forth in the contract submitted by the parent were excessive or unreasonable. Accordingly, any reduction on this basis cannot be upheld. If the IHO was concerned with excessive costs, it would have been permissible for him to instruct the parties to further develop the evidentiary record with respect to that issue.

## VII. Conclusion

The hearing record demonstrates that iBrain was an appropriate unilateral placement for the student for the 2023-24 school year and that equitable considerations do not warrant a reduction or denial of the relief sought by the parent.

I have considered the remaining contentions and find it is unnecessary to address them in light of my determinations above.

**THE APPEAL IS SUSTAINED.**

**THE CROSS-APPEAL IS DISMISSED.**

**IT IS ORDERED** that the IHO's decision, dated November 16, 2023, is modified by reversing those portions which reduced or denied the amount of funding to be paid by the district for the private transportation services for the 2023-24 school year; and

**IT IS FURTHER ORDERED** that the district is directed to fully fund the student's special transportation for the 2023-24 school year as set forth in the relevant contract in the hearing record.

Dated:        Albany, New York
              February 7, 2024



                        STEVEN KROLAK
                        STATE REVIEW OFFICER

---

201[c][1]-[2]). In addition, while a court "may take judicial notice at any stage of the proceeding," a party—upon request—must be provided with the opportunity to be heard "on the propriety of taking judicial notice and the nature of the fact to be noticed" (Fed. R. Evid. 201[d]-[e]). However, if a court "takes judicial notice before notifying a party, the party, on request, is still entitled to be heard" (Fed. R. Evid. 201[e]). The IHO's use of judicial notice in this case also offends State regulation, which requires, in part, that an IHO's decision "shall be based solely upon the record of the proceeding before the [IHO]" (8 NYCRR 200.5[j][5][v]).